302 Ga. 90
FINAL COPY

S17A0931. DANIELS v. THE STATE.
S17A0932. THOMAS v. THE STATE.

HINES, Chief Justice.

In Case No. S17A0931, Demetrius Tyshaun Daniels appeals his convictions and sentences for felony murder, violations of the Street Gang Terrorism and Prevention Act, and possession of a firearm during the commission of a felony, in connection with the death of Alvin Hunt; in companion Case No. S17A0932, Tobias Demere Thomas appeals his convictions and sentences for the felony murder of Bernardino Perez, violations of the Street Gang Terrorism and Prevention Act, armed robbery, aggravated assault, and possession of a firearm during the commission of a felony, in connection with multiple criminal incidents. For the reasons that follow, we affirm in both cases.[1]

---

[1] The crimes for which Daniels and Thomas were indicted occurred on April 25, 2009, and July 2, 2010; Perez was killed on April 25, 2009, and Hunt was killed on July 2, 2010. On March 22, 2011, a Colquitt County grand jury returned an 80-count indictment charging Daniels, Thomas,

and nine other persons with various crimes. Daniels was charged with eight counts in the indictment. Counts 49-56 were based on incidents that occurred in the area of the Shy Manor Apartments in Moultrie. In those counts, Daniels — along with other named indictees including Thomas —  was charged with the felony murder of Hunt while in the commission of aggravated assault, the aggravated assault of Hunt, possession of a firearm during the commission of the felony murder of Hunt, possession of a firearm while in the commission of the aggravated assault of Hunt, and separate violations of the Street Gang Terrorism and Prevention Act for each of these aforementioned crimes. Thomas was charged in 72 counts of the indictment. Counts 1-8 were based on incidents that occurred in the Sardis Church Road area in Moultrie. In these counts, Thomas — along with other named indictees not including Daniels  — was charged with the felony murder of Perez while in the commission of aggravated assault, the aggravated assault of Perez, possession of a firearm during the commission of each of those two crimes, and a violation of the Street Gang Terrorism and Prevention Act for participation in a criminal street gang through the commission of each of those aforementioned crimes. Counts 9-48 were based on incidents that occurred in the Circle Road area in Moultrie. In these counts, Thomas —  along with other named indictees not including Daniels  — was charged with one count of the burglary of the dwelling house of Margaret Ortiz, Samuel Cruz, and Angel Gasper, separate counts of armed robbery regarding each of those three victims, separate counts of aggravated assault regarding each of those three victims, separate counts of the aggravated assaults of Jorge Luiz Ortiz and Javier Santiago, violation of the Street Gang Terrorism and Prevention Act for participation in a criminal street gang through the commission of each of these crimes, separate counts of possession of a firearm during the commission of each of the aforementioned crimes of burglary, armed robbery, and aggravated assault, and violations of the Street Gang Terrorism and Prevention Act for participation in a criminal street gang through the commission of each of the separate counts alleging possession of a firearm during the commission of a crime. Counts 49-56 charged  Thomas —  along with other named indictees including Daniels —   with the felony murder of Hunt while in the commission of aggravated assault, the aggravated assault of Hunt, possession of a firearm during the commission of each of those two crimes, and a violation of the Street Gang Terrorism and Prevention Act for participation in a criminal street gang through the commission of the aforementioned crimes. Counts 65-80 were based on incidents that occurred in the area of 11th Court, a street in Moultrie. In these counts, Thomas was charged with the burglary of the dwelling house of Jimmy Meyers, the armed robbery of Jimmy Meyers, two separate counts of aggravated assault upon Jimmy Meyers, separate counts of possession of a firearm during the commission of each of the aforementioned crimes of burglary, armed robbery, and aggravated assault, and violations of the Street Gang Terrorism and Prevention Act for participation in a criminal street gang through the commission of each of the aforementioned crimes.   Neither Daniels nor Thomas was charged in Counts 57-64 of the indictment. Daniels and Thomas, along with Nyneson Seymore Jeudy, Robert Lee Fuller, Randarius Lamar Perry, and Willie C. Hightower, Jr., were tried together before a jury May 14, 2012 – May 31, 2012. As to Thomas, the trial court directed a verdict of acquittal on Counts 49-56. The jury found Daniels guilty of all crimes with which he was charged, and found Thomas not guilty of Counts 65-80 in the indictment, but guilty of the remaining charges. On July 16, 2012, Daniels was sentenced to life in prison for felony murder, and prison terms totaling 35 years for the crimes that were not

Construed to support the verdicts, the evidence showed that Daniels and Thomas were members of a local street gang known as the "Forrest Hill Boyz," and were tried together, with four other defendants, for their roles in various crimes that took place in and around Moultrie. Of the incidents that resulted in convictions germane to these appeals, the first occurred in the Sardis Church Road area in Moultrie. On the night of April 25, 2009, eyewitnesses heard gunshots and saw an SUV drive away from a mobile home park located on Sardis Church Road. Law enforcement officers arrived and found Perez fatally shot in the chest; he had been paid that day, but no money was found on his person. Alphonso Knighton, who was a co-indictee of Daniels and Thomas, testified that he, Thomas, and Jeudy, each armed with a handgun, drove to the Sardis Church Road neighborhood. When they saw Perez, Jeudy jumped out of

merged or vacated by operation of law. See *Malcolm v. State*, 263 Ga. 369, 372-374 (4), (5) (434 SE2d 479) (1993). On July 16, 2012, Thomas was sentenced to life in prison for felony murder, and prison terms totaling 190 years, to be served both consecutively and concurrently, for the crimes that were not merged or vacated by operation of law. See *Malcolm*, supra. On June 11, 2012, Daniels filed a motion for new trial, which he amended on December 29, 2014; the motion, as amended, was denied on April 28, 2016. Thomas filed a motion for new trial on August 6, 2012, which he amended on October 17, 2014; the motion, as amended, was denied on November 13, 2015. Daniels filed a notice of appeal on April 4, 2016, see *Southall v. State*, 300 Ga. 462, 465 (1) (796 SE2d 261) (2017), and Thomas filed his notice of appeal on December 8, 2015, and the appeals were docketed in this Court for the April 2017 term and submitted for decision on the briefs.

3

the vehicle to rob him. Knighton testified that he heard gunshots, Jeudy got back in the vehicle, told them not to say anything, and they left.  An hour before Perez was killed, Crystal Slaughter was outside her cousin's home and Thomas called her to come over to Jeudy's SUV.  Thomas handed her a cell phone, and she spoke with Danny Hill; the phone call was recorded as Hill was then incarcerated, and had called Thomas from jail.  While Thomas spoke with Hill, Thomas said he had "three heaters,"[2] was "loaded to the T," and was looking for "something to do now."

Another set of crimes occurred later that same night, when Knighton, Jeudy, and Thomas went to a mobile home on Circle Road.  Knighton held a gun on two or three people outside the home, while Jeudy and Thomas went inside it; Knighton, Jeudy, and Thomas had their faces covered, and all three were armed with pistols. Inside, either Jeudy or Thomas grabbed the hair of Margaret Ortiz, who resided in the home, and hit her with a pistol. The assailants demanded money, and Ortiz's husband, Samuel Cruz, told her to give the men her backpack, in which the couple kept money; it contained $1,500, a gold chain, checks, social security cards, and the title to a vehicle; one of the

---

[2] There was testimony that "three heaters" was a reference to three handguns.

assailants also took money from the pockets of Angel Gasper. One of the assailants shot Jorge Luis Cruz and Javier Santiago, who also resided in the home; both of these shooting victims survived. Knighton heard two gunshots, and Jeudy and Thomas ran from the home with what Knighton described as a "pocketbook"; one of the victims saw the three men flee in a vehicle that matched the description of Jeudy's; Jeudy gave Knighton $200 of the robbery proceeds. Thomas told his cousin, Michael Enoch, that he and Jeudy had been involved in robbing, hurting, and killing "some Hispanics," and had obtained about $900 by committing those crimes.

On July 2, 2010 another set of crimes occurred in and around the Shy Manor Apartments in Moultrie. Deon Moore ("Deon") was driving his car with its windows down and his brother Basil Moore ("Basil") and Alvin Hunt as passengers. As they drove past a group of people outside the apartments, someone sprayed liquid from a water gun into the car. Deon stopped, and the three men got out, prepared to fight people in the crowd. Threats to call police were made, and the three men got back into the car and left. Later, Daniels got into a vehicle with co-defendant Robert Fuller and co-indictee Dontavious Jackson. After a phone call, they met Thomas, who distributed handguns to

5

Daniels, Fuller, and Jackson.[3] They then went to the Shy Manor Apartments looking for Hunt, Basil, and Deon, and found them. Daniels, Fuller, and Jackson started firing at Hunt, Basil, and Deon, who were seated on a porch at the complex. Hunt was hit while trying to run away; he was taken to a hospital, where he died of his injuries. Daniels was identified as one of the shooters, but it was unknown who fired the fatal gunshot.

Daniels did not testify at trial. Thomas testified that, as to the Sardis Church Road crimes, he left the company of Jeudy and Knighton before they went to Sardis Church Road, did not see them again that night, and had no involvement in the crimes that occurred on Sardis Church Road or Circle Road. Thomas also testified that he had received a telephone call from Hill, and that during that call, he said that he was "riding around with two heaters. Two or three heaters, something like that." However, Thomas maintained that this was because, during the phone call, Hill had asked that Thomas "flex" during the call, which meant to exaggerate his statements in a "tough" manner; Thomas

_____

[3] Jackson testified to this, but upon Thomas's motion for a directed verdict of acquittal regarding the counts of the indictment pertaining to the Shy Manor incidents, the trial court agreed that the evidence was that Jackson was an accomplice of Thomas's, but his testimony regarding Thomas's involvement in these crimes was uncorroborated, and granted the motion; the directed verdict was granted only as to Thomas.

testified that his reference to "heaters" was in that vein and was inspired by rap song lyrics of an artist named T.I., and that "T.I." was also a nickname that had been given to Thomas.

*Case No. S17A0931*

1. Daniels does not contest the legal sufficiency of the evidence of his guilt. Nevertheless, in accordance with this Court's general practice in appeals of murder cases, this Court has reviewed the record and concludes that the evidence presented at trial authorized the jury to find Daniels guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U. S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Daniels contends that his trial counsel failed to provide effective assistance in several respects. In order to prevail on any such claim, he must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense. *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984). To meet the first prong of the required test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions

7

were "made in the exercise of reasonable professional judgment." Id. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, id. at 784, and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course. *Redding v. State*, 297 Ga. 845, 850 (5) (778 SE2d 774) (2015). To meet the second prong of the test, Daniels must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. *Smith*, supra at 783. "'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

Daniels contends that trial counsel should have moved to sever his prosecution from that of the other defendants. During the hearing on Daniels's motion for new trial, trial counsel testified that he believed it was a better course of action to ensure that Daniels would not be tried separately; counsel noted that Daniels had been offered — and had rejected — a favorable plea deal, and that

8

counsel had reason to believe that if Daniels were tried alone, a co-defendant would accept a deal similar to the one offered to Daniels, and would testify against Daniels, and that this decision was made in consultation with Daniels. Counsel further testified that he believed that the better course of action was to "hide in the weeds" and, as the multi-defendant trial concerned five incidents, and as Daniels was accused of being involved in only one of them, to try to avoid Daniels being mentioned often during trial, and hope that he could remain in obscurity.[4] Counsel's chosen strategy was not patently unreasonable, see *Thomas v. State*, 300 Ga. 433, 438 (2) (a) (1) (796 SE2d 242) (2017); *Harris v. State*, 279 Ga. 522, 529 (6) (615 SE2d 532) (2005), and the fact that Daniels's present counsel might have pursued a different strategic course does not warrant a different conclusion. *Woods v. State*, 291 Ga. 804, 808 (2) (733 SE2d 730) (2012).

Daniels also asserts that trial counsel was "generally ineffective," apparently by asking what present counsel considers an insufficient number of questions during voir dire and the cross-examination of witnesses. During the

---

[4] During closing argument, counsel noted the paucity of evidence naming his client, and that the one witness who testified that Daniels was involved in the crimes contended that four men were involved, a number contradicted by eyewitness testimony.

hearing on his motion for new trial, Daniels did not ask trial counsel any questions about voir dire or the cross-examination of witnesses, and makes no specific argument that trial counsel's conduct was deficient regarding these matters other than to note that counsel for Willie Hightower, who was tried with Daniels, but only on charges arising from a separate incident in which Daniels was not alleged to be involved, was able to secure an acquittal for his client. However, the mere fact that during Daniels's trial, the State failed to prove that Hightower — or anyone else — was guilty beyond a reasonable doubt of the charged crimes arising from this separate incident[5] does not establish that Daniels's trial counsel performed deficiently in pursuing the chosen strategy. Of course, "decisions about what questions to ask on cross-examination are quintessential trial strategy and will rarely constitute ineffective assistance of counsel." *Henry v. State,* 297 Ga. 74, 77 (2) (c) (772 SE2d 678) (2015) (Citation and punctuation omitted.) And, Daniels does not suggest what further questioning of prospective jurors or witnesses trial counsel should have pursued, much less show what evidence might have been produced from such

---

[5] Thomas, the only other defendant tried with Daniels who faced charges with Hightower arising from this incident, was also found not guilty of those charges.

10

questioning, and fails to meet either prong of the *Strickland* test.

*Case No. S17A0932*

3.  Thomas contends that the evidence presented by the State was insufficient to authorize the jury to find him guilty of the crimes of which he was convicted.[6]  See *Jackson*, supra.  He particularly asserts that the testimony of Knighton, who was an accomplice in the Sardis Church Road and Circle Road crimes, was uncorroborated.

At the time of Thomas's 2012 trial, former OCGA § 24-4-8 provided:

> The testimony of a single witness is generally sufficient to establish a fact. However, in certain cases, including prosecutions for treason, prosecutions for perjury, and felony cases where the only witness is an accomplice, the testimony of a single witness is not sufficient. Nevertheless, corroborating circumstances may dispense with the necessity for the testimony of a second witness, except in prosecutions for treason.[7]

---

[6] At various points in his brief, Thomas states that he "adopts his argument and citations as set out in the transcript from the hearing on his Motion for New Trial pages [___] as if set out herein in full," or presents a similar statement.  This briefing technique does not comport with this Court's Rule 22, which states in pertinent part, "[a]ny enumerated error not supported by argument or citation of authority *in the brief* shall be deemed abandoned.  All citations of authority must be full and complete." (Emphasis supplied.)  Accordingly, this opinion will not consider arguments or citations of authority not properly presented in Thomas's brief.  See *Holmes v. State*, 301 Ga. 143, 146 (2) (800 SE2d 353) (2017).

[7] Under the new Georgia Evidence Code, effective for trials conducted on or after January 1, 2013, the necessity for corroboration of accomplice testimony is now codified at OCGA § 24-14-8.

As to the accomplice corroboration requirement,

> it is well established that slight evidence of corroboration is all that is needed. The necessary corroboration may consist entirely of circumstantial evidence, and evidence of the defendant's conduct before and after the crime was committed may give rise to an inference that he participated in the crime.

*McCain v. State*, 300 Ga. 400, 401 (794 SE2d 58) (2016) (Citations and punctuation omitted.)

Evidence corroborating Knighton's testimony regarding Thomas's involvement in the Sardis Church Road crimes included the recorded cell phone call in which Thomas told Hill that he was carrying "three heaters," was "loaded to the T," and looking for "something to do now"; although Thomas in his testimony offered other explanations of those phrases than that he was carrying weapons and seeking a criminal opportunity, the jury was not required to credit this testimony. *Cain v. State*, 300 Ga. 614, 615 (1) (797 SE2d 466) (2017). Further, Thomas was tied to these crimes through the testimony of Eric Lamar and through ballistic evidence. Lamar testified that: on April 19, 2009, he shot Ricky Yates with a .380 pistol; that same day, he went to a location near Thomas's home, telephoned Thomas, and asked Thomas to meet him; Thomas and Jeudy came to meet Lamar; the three men got into Jeudy's vehicle and

12

searched for another man to shoot in retaliation for a prior incident which caused Lamar to be hospitalized; they found the man and shot at him; and after that shooting, Lamar gave the .380 pistol to Thomas and told him to get rid of it. This .380 pistol was recovered on November 5, 2010, by a law enforcement officer after it was discarded by Nathaniel Baker while he was being pursued on foot by law enforcement officers; at the end of the pursuit, Baker ran into a house that bore graffiti indicative of the Forrest Hill Boyz gang. Cartridge casings recovered from the scene of the shooting of Yates, and cartridge casings recovered from the scene of the fatal shooting of Perez were shown to have been fired from the same .380 pistol; it was also shown that at the time of the fatal shooting of Perez, Baker was incarcerated.

Further, Knighton's testimony regarding Thomas's involvement in the Circle Road crimes was corroborated by Thomas's own statements to Enoch. And, as to the violations of the Street Gang Terrorism and Prevention Act, in addition to Knighton's testimony, co-indictee Jackson testified that he was a member of the Forrest Hill Boyz, as was Thomas, and they engaged in street gang activity. See *Pittman v. State*, 300 Ga. 894, 897 (1) (799 SE2d 215) (2017) (Evidence corroborating accomplice testimony "'may be testimony from another

accomplice.' [Cit.]") Two other witnesses, who denied being members of the gang, also testified that Thomas was a member of the Forrest Hill Boyz, and engaged in the activities of that gang.

The evidence presented at trial authorized the jury to find Thomas guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson*, supra.

4. Thomas asserts that the trial court erred in denying his general demurrer.

> An indictment may be challenged by general or special demurrer. A general demurrer "challenges the sufficiency of the *substance* of the indictment." [Cit.] If the accused could admit each and every fact alleged in the indictment and still be innocent of any crime, the indictment is subject to a general demurrer. [Cit.] If, however, the admission of the facts alleged would lead necessarily to the conclusion that the accused is guilty of a crime, the indictment is sufficient to withstand a general demurrer. [Cit.] A special demurrer, on the other hand, "challenges the sufficiency of the *form* of the indictment." [Cit.] By filing a special demurrer, the accused claims "not that the charge in an indictment is fatally defective and incapable of supporting a conviction (as would be asserted by general demurrer), but rather that the charge is imperfect as to form or that the accused is entitled to more information." [Cit.]

*Kimbrough v. State*, 300 Ga. 878, 880 (2) (799 SE2d 229) (2017) (Footnote omitted; emphasis in original.)

14

In his general demurrer, Thomas challenged 12 counts of the indictment; each charged him with a violation of the Street Gang Terrorism and Prevention Act, based upon his participation in criminal street gang activity through the commission of the offense of possession of a firearm during the commission of a felony. Thomas cites in his brief as an example Count 3 of the indictment, which charged Thomas and two other defendants with

> the offense of **VIOLATION OF STREET GANG TERRORISM AND PREVENTION ACT** for the said accused person(s), in the County of Colquitt and State of Georgia, **on or about the 25th day of April 2009**, being associated with Forrest Hill Boyz a/k/a FHB a/k/a So Icy Boyz, a criminal street gang, did unlawfully participate in criminal street gang activity through the commission of the offense of **POSSESSION OF A FIREARM DURING THE COMMISSION OF A FELONY** by unlawfully having on or about his person a firearm during the commission of the crime of Murder as set forth in count 1 above.

Thomas's general demurrer challenged Count 3 of the indictment; it did not challenge Count 1, referred to in Count 3. Count 1 charged Thomas and two other defendants with

> the offense of **VIOLATION OF STREET GANG TERRORISM AND PREVENTION ACT** for the said accused person(s), in the County of Colquitt and State of Georgia, **on or about the 25th day of April 2009**, being associated with Forrest Hill Boyz a/k/a FHB a/k/a So Icy Boyz, a criminal street gang, did unlawfully participate in criminal street gang activity through the commission of the

15

offense of **FELONY MURDER** by causing the death of BERNARDINO PEREZ, a human being while in the commission of an Aggravated Assault, a felony, by shooting said BERNARDINO PEREZ with a firearm.

The other 11 counts of the indictment encompassed in the general demurrer were structured in the same manner as Count 3; they each specified a violation of the Street Gang Terrorism and Prevention Act, based upon participation in criminal street gang activity through the commission of the offense of Possession of a Firearm During the Commission of a Felony, and then identified the felony underlying the possession charge by stating the name of the underlying crime, specifically "as set forth in," and then gave the number of a different count in the indictment.

The trial court did not err in denying Thomas's general demurrer. As to the offenses set forth in an indictment, "each count must be complete within itself and contain every allegation essential to constitute the crime." *State v. Jones*, 274 Ga. 287, 288 (1) (553 SE2d 612) (2001). Nonetheless, "one count [of an indictment] may incorporate by reference portions of another, and the indictment is read as a whole." Id. at 289 (1). Thus, Thomas could not "admit each and every fact alleged in [Count 3 of] the indictment and still be innocent

16

of any crime." *Kimbrough*, supra. Although Thomas notes that Count 1 does not charge the crime of murder, that is of no moment; Count 3 incorporates the language of Count 1, and thus, if Thomas admitted each and every fact alleged in Count 3, he would admit that he "unlawfully ha[d] on or about his person a firearm during the commission of the crime of Murder as set forth in count 1 above," to wit, the felony murder of Perez, "while in the commission of an Aggravated Assault, a felony, by shooting said BERNARDINO PEREZ with a firearm," as that crime is set forth in Count 1, and in admitting those facts, he would admit that he had committed a violation of the Street Gang Terrorism and Prevention Act, as specified in Count 3. The indictment, read as a whole, put Thomas on notice of the crimes charged and against which he must defend and comported with due process; there was no error. *Stinson v. State*, 279 Ga. 177, 178-180 (2) (611 SE2d 52) (2005).

5. Before trial, Thomas moved to sever various counts of the indictment, so that there would be separate trials for: those crimes that took place on April 25, 2009, related to the Sardis Church Road and Circle Road incidents (Counts 1-48); those crimes that took place on July 2, 2010, related to the Shy Manor incidents (Counts 49-56); those crimes that took place on July 9, 2010, related

17

to the robbery of a grocery store (Counts 57-64, in which Thomas was not a named defendant); and, those crimes that took place on July 20, 2010, on or near 11th Court in Moultrie (Counts 65-80, in which Thomas was a named defendant, but for which verdicts of not guilty were returned). Thomas also moved that he be tried separately from all other defendants. The trial court denied these motions, and Thomas asserts that this was error.

However,

[w]hen several defendants are indicted together for a capital crime, but the State does not seek the death penalty, whether the defendants are to be tried together or separately is a matter committed to the sound discretion of the trial court. OCGA § 17-8-4 (a). "In ruling on a severance motion, the court should consider: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses." [Cit.]

*Blackledge v. State*, 299 Ga. 385, 387 (2) (788 SE2d 353) (2016). Although Thomas notes that he was not charged with all of the crimes alleged in the indictment and that the alignment of co-indictees named with him was not consistent as to all of the different crimes, and suggests that confusion on the part of the jury could have resulted, he fails to show any such prejudice. Indeed, the record belies the claim; the jury returned a verdict of not guilty as to Counts

18

65-80 of the indictment, relating to allegations involving crimes that took place at 11th Court on July 20, 2010.

Further, the crimes set forth in the indictment involved allegations of gang activity, and evidence of gang membership, tattoos, and a certain method of disguising their faces that gang members termed "ninja style." And, had there been separate trials, evidence of the gang activities of his co-defendants would have been admissible at his trial. See *Lupoe v. State*, 300 Ga. 233, 242 (794 SE2d 67) (2016). The trial court did not abuse its discretion in denying severance. *Blackledge*, supra.

6. Thomas contends that the trial court violated former OCGA § 17-8-57;[8] that Code section forbade the court from "express[ing] or intimat[ing an] opinion as to what has or has not been proved or as to the guilt of the accused."[9]

---

[8] At the time of Thomas's trial, OCGA § 17-8-57 read:
> It is error for any judge in any criminal case, during its progress or in his charge to the jury, to express or intimate his opinion as to what has or has not been proved or as to the guilt of the accused. Should any judge violate this Code section, the violation shall be held by the Supreme Court or Court of Appeals to be error and the decision in the case reversed, and a new trial granted in the court below with such directions as the Supreme Court or Court of Appeals may lawfully give.

[9] The current version of OCGA § 17-8-57 reads:
(a) (1) It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused.
> (2) Any party who alleges a violation of paragraph (1) of this

19

Thomas first complains that the Code section was violated when the trial court asked a witness for clarification regarding an answer the witness gave when asked if he liked Thomas, to wit, that the witness "didn't know him like that"; when the witness answered that the phrase meant "I know of him, but I don't associate with him," the court further asked, "You don't know him well enough to form an opinion?," to which the witness responded affirmatively. There was no violation of then OCGA § 17-8-57 as "the trial court's questions were posed for the purpose of clarifying the witness'[s] testimony concerning [his] prior statement and did not express or intimate an opinion regarding the credibility of the evidence being offered or the guilt of the accused. [Cits.]" *Alexander v. State*, 294 Ga. 345, 348 (3) (751 SE2d 408) (2013).

---

subsection shall make a timely objection and inform the court of the specific objection and the grounds for such objection, outside of the jury's hearing and presence. After such objection has been made, and if it is sustained, it shall be the duty of the court to give a curative instruction to the jury or declare a mistrial, if appropriate.

(b) Except as provided in subsection (c) of this Code section, failure to make a timely objection to an alleged violation of paragraph (1) of subsection (a) of this Code section shall preclude appellate review, unless such violation constitutes plain error which affects substantive rights of the parties. Plain error may be considered on appeal even when a timely objection informing the court of the specific objection was not made, so long as such error affects substantive rights of the parties.

(c) Should any judge express an opinion as to the guilt of the accused, the Supreme Court or Court of Appeals or the trial court in a motion for a new trial shall grant a new trial.

Thomas also urges that former OCGA § 17-8-57 was violated when the trial judge gave an audible grunt and tossed a pen down on the bench.[10] Thomas contends that this action would be taken by the jury to be a comment upon the evidence, noting that the incident occurred after Thomas's testimony. However, the trial transcript, together with the ensuing discussion between counsel and the court regarding the incident, which was conducted outside the jury's presence, shows that Thomas had already left the witness stand when the court inquired who would be the defense's next witness, and it was then that counsel stated that Thomas rested; it is uncontroverted that any expression of displeasure by the court took place at this point. Accordingly, the record does not support Thomas's contention that the incident "intimated to the [j]ury" that Thomas's testimony "was other than truthful [and] had to be taken by the [j]ury as a derogatory remark" on Thomas's credibility.

Shortly after the sidebar conference at which Thomas's counsel stated that

---

[10] Although the trial transcript does not report these actions, outside the jury's presence, the trial judge conceded that he had acted in this manner, and did so after Thomas had testified in his own behalf, and rested his case, despite the fact that Thomas's counsel had just informed the court that he had three alibi witnesses outside the courtroom "if we have to call them." Counsel's statement regarding alibi witnesses took place during a sidebar conference after the State had objected to counsel's attempt to have Thomas testify regarding a purported transcript of a preliminary hearing; after counsel's statement that alibi witnesses were prepared to testify, the court stated, "[l]et's get away from the transcript, then."

21

alibi witnesses were prepared to testify, see footnote 10, supra, the court rebuked

counsel for attempting to place information before the jury regarding the

purported transcript of a preliminary hearing[11] by Thomas's counsel asking him

if "witnesses testified as to an alibi on your behalf" at such a hearing; the court

warned counsel about "attempting to elicit from him hearsay testimony about a

proceeding outside of this courtroom"; counsel stated that he "would like to

object to the [c]ourt's ruling excluding the fact that there was a preliminary

hearing in that case. And — " The court then declared: "Don't try ringing the

bell again. I'll ring yours. Now proceed." Of course,

> [i]t is the duty of the trial court to control the trial of the case and to
> [e]nsure a fair trial to both sides on the disputed issues in the case.
> Sometimes this requires interference by the court with the conduct
> of counsel [Cit.] [Thomas] has not shown that the trial court abused
> its considerable discretion in the manner in which it dealt with his
> lawyer during [this portion of the trial].

*Bonner v. State*, 295 Ga. 10, 15 (3) (757 SE2d 118) (2014). See also *Buttram*

*v. State*, 280 Ga. 595, 598 (8) (631 SE2d 642) (2006) (The court's final

instructions to the jury included that no ruling or comment the court had made

was "intended to express any opinion upon the facts of the case, upon the

---

[11] Although these incidents served as a basis for Thomas's motion for new trial, during the hearing on that motion, Thomas did not attempt to introduce the purported transcript.

22

credibility of the witnesses, upon the evidence, or upon the guilt or innocence of the defendants.") The court's statement did not constitute a violation of former OCGA § 17-8-57.

7. The trial court instructed the jury:

> The testimony of a single witness, if believed, is generally sufficient to establish any fact. An exception to this rule is made in the case of a felony, as these offenses are alleged to be, where the witness is an accomplice. The testimony of the accomplice alone is not sufficient to warrant a conviction. The accomplice's testimony must be supported by other evidence of some type, and that evidence must be such as would lead to the inference of the guilt of the accused independent of the testimony of the accomplice.

This language was requested by Thomas on May 17, 2012, and appears to be taken from the Georgia pattern jury instructions. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, §§ 1.31.90, 1.31.92 (4th ed. 2007). However, Thomas contends that after he submitted his May 17, 2012 requests to charge the jury, he submitted additional requests on May 24, 2012, and that the trial court erred in failing to give certain of those later requested charges. While it appears from discussion during a conference on the requests for jury charges that Thomas did, in fact, submit some additional requests on or about May 24, 2012, no such requests appear in the record before this Court. Inquiry

23

with the trial court failed to produce any such written requests and, after order of this Court, the trial court has certified that no such requests to charge are to be found in its records; Thomas has not attempted to supplement the record with any additional jury instructions filed after May 17, 2012. See OCGA § 5-6-41 (f), (g). Of course, requests to charge the jury are to be submitted in writing[12] and "[a] request to charge has to be 'legal, apt, and precisely adjusted to some principle involved in the case and be authorized by the evidence.' [Cit.]" *Barron v. State*, 297 Ga. 706, 708 (2) (777 SE2d 435) (2015). Further, "[t]he burden is on him who asserts error to show it affirmatively by the record [Cit.]," *Kemp v. State*, 226 Ga. 506, 507 (2) (175 SE2d 869) (1970), and Thomas's failure to pursue the available statutory provisions to ensure that the record before this Court reflects that which he contends occurred prevents this Court from considering his assertion that the trial court erred in rejecting requests for jury instructions.

Nonetheless, Thomas states in his brief that for the trial court to fail "to

---

[12] Uniform Superior Court Rule 10.3 reads:

> All requests to charge shall be numbered consecutively on separate sheets of paper and submitted to the court in duplicate by counsel for all parties at the commencement of trial, unless otherwise provided by pre-trial order; provided, however, that additional requests may be submitted to cover unanticipated points which arise thereafter.

24

give the full charge" was plain error, and it appears that by "the full charge,"

Thomas intends to refer to the complete language of Suggested Pattern Jury

Instructions §§ 1.31.90 and 1.31.92.[13] This Court has previously stated the test

for a finding of plain error.

> First, there must be an error or defect — some sort of deviation from a legal rule — that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the

---

[13] Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.31.90 (4th ed. 2007) reads:
> The testimony of a single witness, if believed, is sufficient to establish a fact. Generally, there is no legal requirement of corroboration of a witness, provided you find the evidence to be sufficient.

Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 1.31.92 (4th ed. 2007) reads:
> An exception to this rule is made in the case of (specify felony charge), where the witness is an accomplice. The testimony of the accomplice alone is not sufficient to warrant a conviction. The accomplice's testimony must be supported by other evidence of some type, and that evidence must be such as would lead to the inference of the guilt of the accused independent of the testimony of the accomplice.
>
> It is not required that supporting evidence be sufficient to warrant a conviction or that the testimony of the accomplice be supported in every material particular.
>
> The supporting evidence must be more than that a crime was actually committed by someone. It must be sufficient to connect the accused with the criminal act and must be more than sufficient to merely cast upon the accused a grave suspicion of guilt.
>
> Slight evidence from another source that connects the accused with the commission of the alleged crime and tends to show participation in it may be sufficient supporting evidence of the testimony of an accomplice. In order to convict, that evidence, when considered with all of the other evidence in the case, must be sufficient to satisfy you beyond a reasonable doubt that the accused is guilty.
>
> (Insert here .93 or .94 charge(s) below only if applicable)
>
> The sufficiency of the supporting evidence of an accomplice is a matter solely for you to determine.
>
> Whether or not any witness in this case was an accomplice is a question for you to determine from the evidence in this case.

legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the *discretion* to remedy the error — discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. [Cit.]

*Cheddersingh v. State*, 290 Ga. 680, 683 (2) (724 SE2d 366) (2012) (Emphasis in original.)  See also *Simmons v. State*, 299 Ga. 370, 373 (2) (788 SE2d 494) (2016).  "Beyond showing a clear or obvious error, plain-error analysis requires the appellant to make an affirmative showing that the error probably did affect the outcome below." *Jones v. State*, 299 Ga. 40, 42-43 (2) (785 SE2d 886) (2016) (Citation and punctuation omitted.)

Pretermitting whether the charge as given to the jury represents "an error or defect," although the complete language of Suggested Pattern Jury Instructions §§ 1.31.90 and 1.31.92 contains amplification regarding the jury's obligation to find corroboration of an accomplice's testimony that would lead to an inference of Thomas's guilt, independent of the testimony of the accomplice, the charge as given properly informed the jury of what corroboration was required.  Further, "[j]ury instructions are read and

26

considered as a whole in determining whether there is error [Cit.]," *White v. State*, 281 Ga. 276, 280 (4) (637 SE2d 645) (2006), and the jury was instructed on reasonable doubt, participation in a crime, "mere presence" at the scene of a crime, and that "grave suspicion" does not authorize a conviction. Accordingly, there is no likelihood that the failure to instruct the jury using the complete language of Suggested Pattern Jury Instructions §§ 1.31.90 and 1.31.92 affected the outcome of the trial, and there was no plain error. *Allen v. State*, 290 Ga. 743, 746 (3) (723 SE2d 684) (2012).[14]

8. In his final enumeration of error, Thomas asserts that the cumulative effect of all of the alleged errors raised above deprived him of due process. But, Thomas has failed to demonstrate *any* error by the trial court. See Divisions 3-6, supra. "Moreover, with regard to asserted errors by the trial court, a cumulative error rule is not applied. [Cit.]" *Brown v. State*, 285 Ga. 772, 774 (3) (683 SE2d 581) (2009). To the extent that Thomas contends that a new trial is warranted based on his contention that testimony presented against him was false, the jury was fully instructed on its role in determining the facts and resolving evidentiary

---

[14] We also note that, as the State contends, the language that Thomas states in his brief should have been given as part of the jury instructions either constitutes a comment on the evidence, or is addressed elsewhere in the jury instructions. See OCGA § 17-8-57; *White*, supra.

issues, as well as its role regarding witness credibility. Thomas's convictions stand.

Judgments affirmed. All the Justices concur.

Decided September 13, 2017.

Murder. Colquitt Superior Court. Before Judge Gray, Senior Judge.

Conger & Smith, Gregory D. Smith, for appellant (case no. S17A0931).

Jon W. McClure, for appellant (case no. S17A0932).

Bradfield M. Shealy, District Attorney, April M. Hancock, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Meghan H. Hill, Assistant Attorney General, for appellee.