320 Ga. 333
FINAL COPY

S24A0578. CAMPBELL v. THE STATE.
S24A0580. SANDERS v. THE STATE.
S24A0581. PARRISH v. THE STATE.
S24A1180. SPEAKS v. THE STATE.

WARREN, Justice.

In November 2018, Jordan Campbell and Roderick Parrish were convicted of felony murder and other crimes related to the death of Rebecca Foley. At the same trial, Shacqeal Sanders and Henry Speaks were convicted of malice murder and other crimes related to the death of James Pastures and aggravated assault of Maurice Harris. All four defendants were also convicted of gang-related charges. They appeal their convictions. For the reasons discussed below, we affirm in all four cases.[1]

---

[1] Foley was killed in January 2013, and Pastures was killed and Harris was assaulted in January 2015. In August 2016, a Chatham County grand jury indicted Campbell, Parrish, Sanders, Speaks, and Kevin Smith together in a 59-count indictment. (Smith's case is not part of this appeal.) Campbell and Parrish were jointly charged with malice murder of Foley, two counts of felony murder based on aggravated assault, felony murder based on possession of a

firearm by a first offender probationer, two counts of aggravated assault (with a deadly weapon and with intent to rob), two counts of possession of a firearm during the commission of a felony, and eight counts of violation of the Street Gang Terrorism and Prevention Act (the "Gang Act") (based on each alleged count). Parrish was also charged with possession of a firearm by a first-offender probationer and violation of the Gang Act based on that crime. Sanders and Speaks were jointly charged with malice murder of Pastures, felony murder, two counts of conspiracy to commit murder (based on Pastures and Harris), two counts of aggravated assault, criminal attempt to commit murder (of Harris), five counts of possession of a firearm during the commission of a felony, and 12 counts of violations of the Gang Act.

The defendants' first trial resulted in a mistrial on October 26, after evidence was presented that one of the jurors was threatened by relatives of Campbell and Parrish. The case was then re-tried from October 29 to November 18, 2018. The jury found Campbell guilty on all counts, except malice murder and the related gang count, on which the jury could not reach a verdict. The jury found Parrish guilty on all counts except malice murder and the associated Gang Act count, on which the jury could not reach a verdict. The jury found Sanders guilty on all counts, except criminal attempt to commit a felony and two violations of the Gang Act, on which the jury could not reach a verdict. The jury found Speaks guilty on all counts except criminal attempt to commit a felony, one count of aggravated assault, two counts of possession of a firearm during a felony, and three Gang Act counts, on which the jury could not reach a verdict. All of the counts on which the jury could not reach a verdict were later nolle prossed.

The defendants were sentenced in November and December 2018. The trial court sentenced Campbell to serve life without parole for one felony murder count, and a total of 65 additional years for the counts that were not vacated or merged. The court sentenced Parrish to serve life without parole for felony murder and an additional 75 years on the counts that were not vacated or merged. The court sentenced Sanders to serve life without parole for malice murder and an additional 105 years for the counts that were not vacated or merged. The court sentenced Speaks to serve life without parole for malice murder and an additional 70 years for the counts that were not vacated or merged. Each defendant filed a timely motion for new trial and amended it with new counsel.

In January 2023, after evidentiary hearings, the trial court denied the motions filed by Campbell, Parrish, and Sanders. The court granted Speaks's motion to be resentenced because the sentence for conspiracy to commit

1. The evidence presented at trial showed the following.

(a) *Gang Evidence*

Extensive testimony about the East Gangster Bloods ("EGB") gang, a subset of the Bloods gang, was presented. Sergeant Robert Santoro testified that members of this gang commit crimes to make money for the gang and "do violence" to "gain status within the gang." He explained that the gang "operates based off . . . violence, fear, and intimidation," and the gang members "share[ ] firearms and weapons and they pass them from one to the other."

Sergeant Santoro also testified that documents recovered from EGB gang members indicated that Sanders and Speaks were high-

---

murder was outside of the statutory range, but denied the rest of his motion for new trial. Each defendant filed a timely notice of appeal. This Court dismissed Speaks's first appeal as not ripe because although the trial court ruled that Speaks would be resentenced, the resentencing had not yet occurred. On remand, Speaks was resentenced to life with the possibility of parole for malice murder, ten years in prison for the conspiracy charge that did not merge and five years for the firearm possession count that was not merged or vacated; the sentences for the gang counts (15 years for each of the three counts that were not merged or vacated) were converted to probation. Speaks then filed a timely appeal. Campbell's, Sanders's, and Parrish's cases were docketed to the April 2024 term of this Court; Speaks's case was docketed to the August 2024 term. All of the cases were submitted for a decision on the briefs. We have consolidated these appeals for purposes of this opinion.

ranking members of the gang and that Campbell and Parrish were members with no rank. Testimony and photographs also showed that the defendants had gang-related tattoos, wore gang colors, and displayed gang signs. In interviews with police officers, Campbell and Parrish admitted that they were members of the Bloods gang, and Parrish said that Smith and Pastures were members. Harris testified that he, Campbell, Parrish, Smith, and Speaks were all in the Bloods gang.

(b) *Foley's Murder*

Shortly before 7:00 p.m. on January 21, 2013, Rebecca Foley drove into the parking lot of her apartment building. Her boyfriend arrived in his car "at least a couple minutes" later and saw her car "up against" a parked car. He found her "laid over to the side" in the driver's seat of her car, and he called 911.[2] Foley had been killed by a gunshot to her back.

Two months later, in March 2013, two men in a car shot at

---

[2] He made this 911 call at 6:55 p.m.

Samuel Barnes and then crashed into the back yard of Jennifer and Timothy Parker's house. Jennifer saw one man, whom she later identified in a photo line-up and in court as Kevin Smith, get out of the car after the crash carrying a gun. Smith asked Timothy to take the gun. Timothy refused, but Jennifer gave Smith a plastic bag, and Smith put the gun in the bag and tied it. After he tied it, Jennifer noticed there was a smear of what appeared to be blood on the outside of the bag. The second man, whom Jennifer later identified in a photo line-up as Pastures, came out of the driver's side of the car and "banged" on the Parkers' door, saying, "You didn't see nothing. . . . It was just me." The police later arrested Smith and Pastures. When police searched the area around the Parkers' yard, they found the plastic bag with the gun, which was a Taurus 585 .380-caliber. The blood on the bag matched Smith's DNA. Through forensic testing, police established that the gun matched the bullet and shell casing found at the scene of Foley's shooting two months earlier.

Detective Alan Sammons interviewed Smith twice. In a March

2013 interview, Smith said that on the night of the wreck he was in the car with Pastures, that they were on the way home from drinking at a club, and that "they were driving fast and all of a sudden they were in a wreck." Smith said that "he never saw a gun in the car." In the interview on May 13, 2013, Smith admitted that he had a gun on the night of the wreck and said that he got it from Parrish in early March 2013. The day after his May interview, Smith called his girlfriend from jail to ask her to provide an alibi for him for January 21, 2013, even though the girlfriend "wasn't sure of his whereabouts" on that day. Smith also called Campbell, and Campbell said, "I just hope that s**t don't come back to me . . . cause the n**ga was there, bros," and "It was two of your homies, too." Smith assured Campbell that he gave the police "straight run arounds."[3]

Campbell and Parrish were also interviewed by police officers

---

[3] Smith also made statements about Foley's murder and the car accident with Pastures in a document entitled "Declaration of Truth, Sworn Affidavit," which was found in Smith's cell in October 2018. That document is discussed further in Division 5 below.

in May 2013 about Foley's murder. Campbell said that Smith and Pastures were his "homeboys," but that he did not know anything about Foley's murder and was not near the area where the murder occurred. Parrish said that on January 21, 2013, "Pastures and others [came to] his house . . . and ask[ed] him to come along and take part in a lick."[4] Parrish refused and stayed home. When Pastures and the others returned, they stood "in front of his house in the street talking," and Parrish heard them talk "about having shot a white girl on White Bluff Road"[5] and "having to get rid of the Taurus .380." Parrish also said that "Pie," a nickname later identified as Speaks's, said that "the girl was shot because she drove off and the lick had failed." Parrish said that the gun used in the shooting belonged to Campbell and he saw Smith give it to Campbell in the early morning hours of January 22, 2013.

Parrish was interviewed again in July 2015 and said that his

---

[4] Investigator Sammons, one of the officers who interviewed Parrish, testified that "lick" means "armed robbery."

[5] The apartment building where Foley was shot was located off White Bluff Road.

May 2013 statement—that is, that he did not go with Smith and Pastures—was a lie. He then offered police the following narrative. On January 21, 2013, Smith and Pastures came to his house and asked if he wanted "to ride around and find something to do." Parrish agreed, and he and Campbell went "riding around" with them. Campbell told them to go to the apartment complex where he was living at the time.[6] Once there, Campbell went inside his apartment and returned about ten minutes later. Then Smith said, "I see something, Man," and told Pastures to "pull up in there." Pastures moved the car, and Smith got out and ran up to a "lady at the mailbox." The woman, who was in her car at this point, "pull[ed] up some" to get away, and then "he"—referencing Smith—"shot." Parrish "didn't even know what was going on" and "just panicked," got out of the car, and "just ran, because [he] was scared." Campbell also got out of the car and ran.

Parrish said that he knew that Pastures and the others with

---

[6] Evidence presented at trial showed that this complex was across the street from Foley's apartment complex.

whom he got in the car referred to themselves as "Team Spank," and "spank" means "to shoot." Parrish told the police that he would take them to where he saw the shooting happen, but he then took them to a place where he would not have been able to see the area where the police knew the murder occurred. Parrish said that he was afraid of retaliation from the EGB and so had stopped spending time around his old neighborhood and around EGB members, but police officers knew that he spent time with Campbell, who was an EGB member, and that he was seen in pictures with other EGB members. Parrish was arrested after this interview.

In April 2016, Jay Buchans, who shared a cell with Parrish, talked to Sergeant Santoro about statements Parrish made to him regarding Foley's murder.[7] Buchans said that Parrish told him the following. There were "three or four of them" driving around in the car, including "their driver and [Parrish's] stepbrother," Campbell.[8] "[T]hey had a pistol" and were "looking for somebody to rob" to "get

---

[7] Buchans's interview is further discussed in Division 5 below.

[8] Campbell's mother was married to Parrish's father.

some money, buy some dope, flip it, and make some money." Parrish and Campbell had decided that they were "going to get some money or somebody was going to die." Near the apartments where Campbell lived, they approached a "girl" to rob her. Campbell got out of the car, and the "guy that was driving the car and . . . the other guy [who] was in the car" were "trying to talk [Campbell] out of it." Parrish "hung out and made sure the driver didn't drive off." The "girl" tried to drive away, and Campbell "shot her in the back of the head"; then Parrish and Campbell "ran over" to Campbell's apartment building. The gun Campbell used belonged to Parrish; Campbell told Parrish, "Give it here. I'll do it." Campbell then gave the gun back to Parrish after the shooting, and Parrish "sold it to this guy that got caught with it."[9]

---

[9] Buchans was interviewed by police officers again a few days before trial began, and he said that he did not "want to recall" what he told police in his April 2016 interview and indicated that he was afraid of retribution from the Bloods gang, saying "I can't go up there with a bunch of Bloods. . . . They'll put a hit out on me. I just can't do it." At trial, Buchans recanted much of what he told the police, testifying that the information was "little facts and lies" he told because he was "trying to get out of trouble" and wanted a deal on his criminal charges. Buchans testified that in his 2016 interview he made up some information and gleaned other information from news stories and trial

Sergeant Santoro testified about maps created based on records showing which cell phone towers Campbell's and Parrish's phones were connected to on the day of the murder. The records showed that at around 6:03 p.m., Campbell's and Parrish's phones were both in the area that was served by the same cell phone tower as Parrish's house.[10] At 6:16 p.m., Parrish's phone started to move away from his house and toward the apartment complex where Foley was murdered. And at 6:42 p.m., Parrish's phone was in the area of the murder. The next time Campbell's phone connected to a cell phone tower was at 6:55 p.m., and the phone was in the cell-phone-tower sector next to the murder location. Sergeant Santoro explained that this location was consistent with Campbell's cell

---

documents Parrish had in the jail cell he shared with Buchans. Sergeant Santoro testified that in his 2016 interview, Buchans gave details that had not been released to the media and Buchans told the detective that he had not looked at any of Parrish's case paperwork.

[10] Initially, Parrish said that he had loaned his phone to another gang member on the night of the murder, and that the gang member returned it to him the next day. But eventually Parrish admitted that story was a lie and that he had his cell phone with him on the night of Foley's murder. Campbell also admitted that he had his phone that night.

phone leaving the scene after the shooting and moving toward Campbell's apartment.[11] Both phones then moved away from the murder scene, and a few minutes before 7:30 p.m., they were near Parrish's house.

(c) *Pastures's Murder*

In January 2015, Pastures and his roommate, Harris, heard that they were in trouble with the gang, and on January 19, Pastures asked Sanders and Speaks to return the guns that Sanders had been keeping for Pastures.[12] Around 5:00 p.m., Sanders and Speaks arrived at Pastures and Harris's apartment, ostensibly to return the guns. Harris testified that Pastures went to Sanders and Speaks's car first. Sanders then called Harris to the car, and as

---

[11] As explained above, Foley's boyfriend called 911 at 6:55 p.m. The State argued that Foley's murder must have occurred shortly before that, between the time Foley arrived at the apartment complex and the time her boyfriend arrived.

[12] Harris testified that a "couple of weeks" before Pastures was shot, Sanders shot a gun from Pastures and Harris's apartment into the neighbor's apartment, and they were not sure if the neighbor had been shot. At that point, Pastures had "six or seven guns" in the apartment, and Harris told Pastures to "get [the guns] out of here . . . [b]ecause I know the police are coming." Sanders then took the guns.

Harris approached, he saw Sanders shoot Pastures. Harris started running away. As he ran, Pastures's friend, who was sitting in a car nearby, saw Speaks chasing and shooting at Harris. Harris was not hit, but Pastures had been shot twice and died from his injuries. Cell phone records indicated that Sanders's and Speaks's phones were traveling together before and after Pastures's murder; there was no phone activity during the time of the murder.

Evidence was presented at trial that gang members were suspicious that Pastures had spoken to police about Foley's murder and that Pastures had been "put on a plate," which one of the lead investigators testified was a gang term that meant Pastures would be killed. In a call Smith made from prison on May 25, 2013, to Yusef Sanders, Sanders's father and a fellow gang member, Smith explained that the police knew that the alibi his girlfriend had given for him was false and that the only person he told about his girlfriend providing this alibi was "James."[13] Yusef said they were trying to find out who was "talking." In his July 2015 interview with

---

[13] Pastures's first name was James.

police, Parrish said that the gang "had word" that Pastures was talking to the police. A document found in Parrish's prison cell said, "No time for a case, so we killing the witness." Buchans, Parrish's cellmate, testified that Parrish told him that after the Foley murder, they were "worried about the driver telling," and further testified that he got the impression that Campbell ordered the guy that was driving the car to be killed.

Sergeant Santoro testified about a document found in Speaks's cell, which was stipulated to have been written by Speaks. Sergeant Santoro described this letter as a "rehearsed version of what" was "supposed to be said" about Pastures's murder at trial. In this story, Speaks and Sanders drove to Pastures's apartment and when they were returning Pastures's guns, Pastures pulled a "gun off his hip" and said he heard that Speaks and Sanders were supposed to kill him; Sanders then shot Pastures in self-defense.

*Arguments Raised by Campbell, Parrish, and Speaks*

2. Campbell, Parrish, and Speaks argue that the trial court erred by denying the defendants' motion to sever the trial of the

14

defendants and counts related to Foley's murder from the trial of the defendants and counts related to Pastures's murder. As explained above, Campbell and Parrish were indicted for crimes related to Foley's murder, and Speaks was indicted for crimes related to Pastures's murder, so if the trial court had granted their motion to sever, Campbell and Parrish would have been tried together for the crimes related to Foley's murder and, separately, Speaks, along with Sanders and Smith, would have been tried together for the crimes related to Pastures's murder.[14]

We review the trial court's denial of the motion to sever for an abuse of discretion. See *McCabe v. State*, 319 Ga. 275, 286 (903 SE2d 78) (2024). As to the joining of defendants for trial, "[w]hen [two or more defendants are] indicted for a capital felony when the death penalty is waived, or for a felony less than capital, . . . such

---

[14] Parrish alone briefly argues that his case should have been severed not only from the defendants related to the other (Pastures) murder, but also from the defendants charged with the same murder as he was (the Foley murder). He does not, however, offer any argument distinct from the arguments rejected below. Thus, this claim, to the extent Parrish has properly raised it, is similarly rejected.

defendants may be tried jointly or separately in the discretion of the trial court." OCGA § 17-8-4.

> When ruling on the motion to sever [defendants], a trial court should consider three factors: (1) the likelihood of confusion of the evidence and law; (2) the possibility that evidence against one defendant may be considered against the other defendant; and (3) the presence or absence of antagonistic defenses. To show that severance is required, the defendant must do more than point to the presence of antagonistic defenses or the possibility that he has a better chance of acquittal in a separate trial. Rather, he must show that a joint trial was so prejudicial as to amount to a denial of his right to due process.

*McCabe*, 319 Ga. at 286 (citation and punctuation omitted). As to the joinder of counts, "[a] defendant has a right to severance where the offenses are joined solely on the ground that they are of the same or similar character because of the great risk of prejudice from a joint disposition of unrelated charges," but where the joined counts are "based upon the same conduct or on a series of acts connected together or constituting parts of a single scheme or plan, severance lies within the sound discretion of the trial judge since the facts in each case are likely to be unique." *White v. State*, 319 Ga. 367, 377-383 (903 SE2d 891) (2024) (citations and punctuation omitted). If

16

"evidence of one offense would be admissible at a separate trial for the other," the offenses "are not joined together 'solely because they are the same or similar character,'" meaning severance is not required, and "[t]ypically, a trial court does not abuse its discretion in denying a motion to sever where evidence of one charge would be admissible in the trial of the other and there is no evidence that the joinder confused or misled the jury." Id. (citations and punctuation omitted).

Because the two groups of defendants here were not charged in any of the same counts, the defendants argue that the combination of the counts related to the two murders at the same trial allowed the State to present evidence that would have been inadmissible in the trials for one of the murders alone. We disagree. The two murders were connected by the evidence that Pastures was killed by EGB gang members to cover up Foley's murder, which was committed by other EGB members. Thus, at a trial of Foley's murder, evidence of Pastures's murder would have been relevant to prove the gang charges because it showed the gang's efforts to cover

17

up Foley's murder, indicating that Foley's murder was "criminal gang activity." See OCGA § 16-15-4 (a) ("It shall be unlawful for any person . . . associated with a criminal street gang to conduct or participate in criminal gang activity . . . ."). And at a trial of Pastures's murder, evidence of Foley's murder could have been presented to show the motivation for Pastures's murder. See *Johnson v. State*, 312 Ga. 481, 492 (863 SE2d 137) (2021) (holding that the evidence of a shooting in which the appellant was not charged was admissible in appellant's trial because it "pertained to the chain of events" of the charged crimes and "indicat[ed] that these incidents were related to the ABG gang"); *White*, 319 Ga. at 378-383 (holding that the trial court did not abuse its discretion by failing to sever the trial of counts of financial crimes from a murder trial where the financial crimes provided some evidence of the defendant's motive for the murder).

Also, the Foley-murder and Pastures-murder defendants did not present defenses antagonistic to each other, and they have not shown any likelihood that the jury considered evidence about one

defendant against another or was confused about the evidence or the law. Thus, the trial court did not abuse its discretion in denying the motion to sever. See *McCabe*, 319 Ga. at 287-288 (holding that the trial court did not abuse its discretion by denying the motion to sever when the evidence the defendant argued would not have been admitted in a severed trial "was a relevant part of explaining the plan and motive for his criminal conduct"); *Daniels v. State*, 302 Ga. 90, 100 (805 SE2d 80) (2017) (holding that the trial court did not abuse its discretion by denying the motion to sever when "evidence of the gang activities of his co-defendants would have been admissible at [the defendant's separate] trial").

3. Campbell, Parrish, and Speaks also argue that the trial court erred by admitting evidence of juror intimidation that happened at their first trial.

(a) Near the beginning of the second trial, the State gave notice of its intent to introduce evidence of juror intimidation that happened in the first trial. The defendants objected, arguing that the evidence was not admissible because there was no evidence that

19

any of the defendants directed the intimidation. The trial court ruled that the evidence was admissible, concluding that arguments about the defendants' lack of involvement "goes to the weight, not the admissibility."

Juror Number 8 from the defendants' first trial testified at the second trial (the one at issue here) that on October 25, 2018, as she was leaving the courthouse after a day of testimony, she was sitting in her car at a traffic light and another car pulled up next to her. The passenger in that car shouted at her, "All clear, BLATT, BLATT" and made a hand gesture that looked like a gun. The juror, who had heard testimony during the first trial about gang terms such as "BLATT," testified that she understood this to mean, "you're gone, you're out of here, you're dead." When the court heard about this threat the next day, it declared a mistrial.

At the second trial, Sergeant Santoro testified that "BLATT" is a gang term that means "Blood Love All The Time" and that the people who threatened Juror Number 8 were Roderick Parrish, Sr. (Parrish's father and Campbell's stepfather), and Anne Parrish

20

(Campbell's mother and Parrish's stepmother). In its opening statement, the State mentioned the juror intimidation, explaining that the people in the car trying to intimidate the juror were "Anne Parrish and Roderick Parrish, Sr. The father of Roderick Parrish and Jordan Campbell. . . . That's what this gang does. That's the terror they try to spread." In closing argument, the State again mentioned the juror intimidation evidence, saying: "You heard about Anne Parrish and Roderick Parrish, Sr., who were willing to yell threats at a juror to thwart the previous trial of the case. They were willing to risk that on behalf of their children."

During the final jury charge, the trial court instructed the jury that evidence of "third persons' contact with a juror at the prior trial was conditionally admitted . . . and may be considered by you on the issues of criminal gang activity, if any, and conspiracy." The court explained that none of the defendants was charged with juror intimidation and defined that crime. The court further explained that to consider this evidence with regard to a defendant, the jury must first find that "the alleged intimidation was made with the

21

authorization of such defendant," and if the jury found that the defendant or defendants did authorize the alleged intimidation and it was done in the course of criminal gang activity or in furtherance of a conspiracy, the jury could consider the evidence "on the issues of conspiracy and criminal gang activity only." The court said that if the jury did not find that intimidation occurred and that a defendant or defendants authorized it, the jury should "disregard" the evidence.[15]

(b) Evidence of an attempt to influence a juror may be relevant to show "consciousness of guilt" of the charged crimes. See *West v. State*, 305 Ga. 467, 474 (826 SE2d 64) (2019). However, such evidence is relevant evidence of the defendant's guilt only if the

---

[15] In the jury instructions, the court initially told the jury to consider the evidence only if it found that the State proved "beyond a reasonable doubt" that the defendants authorized the intimidation. After the court finished the jury charge and dismissed the jury, the State objected to the court's use of "beyond a reasonable doubt" in this instruction. The trial court recalled the jury and corrected this instruction, saying: "I mistakenly said that the State would have to prove the intimidation occurred beyond a reasonable doubt," but because the defendants were not charged with the offense of juror intimidation, "it's not a beyond a reasonable doubt kind of thing." The court then repeated the remainder of the instruction, including that the jury should not consider the evidence at all if the jury found that a defendant did not authorize it.

defendant was involved in the attempt. See id. (concluding that the evidence was sufficient to show that the defendant was involved in the attempt to influence the juror where the defendant's prison podmate, with the defendant next to him at the time, called the podmate's mother and asked her to create a fake Facebook profile and use it to influence a juror). See also *Wade v. State*, 304 Ga. 5, 12 (815 SE2d 875) (2018) (explaining that evidence of an attempt to influence a witness may be introduced "where it is established that the attempt was made with the authorization of the accused" and that "evidence of a threat or attempt to influence a witness made by a third party must be linked to the defendant in order to be relevant to any material issues").

Here, the evidence presented did not establish that the defendants were involved in the juror intimidation. The only evidence presented that any of the defendants authorized Roderick, Sr., and Anne to threaten the juror was the use of a gang term (i.e., BLATT), which suggested a link between the intimidation attempt and the gang in which the defendants were members, and the

23

familial connection Roderick, Sr., and Anne had with Campbell and Parrish. However, there was no evidence that anyone in the gang, let alone one of the defendants, directed the juror intimidation, and the mere familial relationship was not sufficient "to support a reasonable and plain inference" that the attempt to intimidate the juror was made "with the authorization" of Campbell or Parrish. Thus, the trial court erred by admitting the evidence of juror intimidation. See *Kell v. State*, 280 Ga. 669, 672 (631 SE2d 679) (2006) (holding that evidence of intimidating a witness should not have been admitted because "[t]he mere family relationship between appellant and [the person accused of intimidating the witness] is not enough, without more, to constitute adequate proof of the necessary authorization").

However, this error was harmless.

The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict. In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so.

*Rooks v. State*, 317 Ga. 743, 762 (893 SE2d 899) (2023) (citation and punctuation omitted).

First, we note that, as explained above, the trial court instructed the jury to consider the evidence of juror intimidation only if it found that one or more of the defendants authorized the intimidation, and not to consider the evidence at all if the jury found that a defendant did not authorize the intimidation. And "we presume that the jury followed" the instructions it was given. See *Rooks*, 317 Ga. at 763 (noting that a limiting instruction given with evidence supported a conclusion that the assumed erroneous admission of the evidence was harmless).

As to Campbell and Parrish, the State presented strong evidence of their guilt for the charged crimes. As discussed above, Campbell indicated on the phone with Smith that he was worried about any charges related to Foley's murder "com[ing] back to [him]." Also, Parrish told police that both he and Campbell drove with Pastures and Smith to the apartment complex and were in the car with them right before Foley was shot, and Parrish told Buchans

25

that he and Campbell drove to the apartment complex in order to rob someone, that they planned "to get some money or somebody was going to die," and that Campbell shot Foley. Also, the locations of Campbell's and Parrish's cell phones were consistent with their being present at the location of Foley's murder. The evidence also showed that Campbell and Parrish were in a gang; that its members committed crimes to make money for the gang; that Campbell and Parrish planned to rob someone to "get some money, buy some dope, flip it, and make some money"; and that after the Foley murder, Pastures was "put on a plate" by the gang because gang members were suspicious that he was talking to the police.

Moreover, as discussed above, the only evidence linking Campbell and Parrish to the threat against Juror Number 8 was the use of gang terms and Campbell's and Parrish's familial relationships with the people who engaged in the intimidation. Thus, it is "highly probable" that this evidence did not contribute to the jurors finding Campbell and Parrish guilty of the charged crimes. See *Adams v. State*, 318 Ga. 105, 119 (897 SE2d 396) (2024)

26

(concluding that the admission of evidence that the defendant's brother stole a gun and gave it to the defendant was harmless in part because the State never argued that the appellant "played any role in the theft of the weapon or was even aware that it had been stolen" and to the extent the evidence "impugn[ed] anyone's character," it impugned the character of the defendant's brother, who was not charged in the case).

As to Speaks, the evidence showing that he took part in Pastures's gang-motivated murder was strong, including that Speaks went to Pastures and Harris's apartment with Sanders, and Sanders's friend saw Speaks shoot at Harris as Harris ran away. Moreover, there was no evidence linking Speaks to Roderick, Sr., or Anne in any way. In fact, in opening statement and closing argument, the State focused on the familial link Roderick, Sr., and Anne had to Parrish and Campbell—not Speaks—including arguing in closing that Roderick, Sr., and Anne tried to intimidate a juror "on behalf of their children." Thus, it is highly probable that the evidence of juror intimidation in the first trial did not contribute to

27

the jurors finding Speaks guilty of the charged crimes. See *Adams*, 318 Ga. at 119.

4. Campbell, Parrish, and Speaks argue that the trial court erred by instructing the jury on "deliberate ignorance."

(a)   The State requested that the trial court charge the jury on "deliberate ignorance," arguing that the instruction was justified because the defendants gave conflicting accounts of how much they knew about whether a robbery was going to happen before Foley was killed, and noting that Parrish in particular said that he did not know there was going to be a robbery or murder. The court granted the State's request.

During closing argument, the State referenced this instruction, saying:

> There's another concept you need to think about with respect to knowledge; it's called deliberate ignorance. The State can show or prove knowledge, if we can show that a defendant deliberately closed his eyes to the obvious. And I'm talking about Roderick Parrish and the stories he has told that "We had no idea, [Campbell] and I had no idea there was going to be a robbery."
>
> Now, of course he actually told the police in 2013 there was going to be a robbery. And he has all this social

28

media about, this is what I do, a robbery. I do licks.[16] But what did he say? "Oh, we had no idea." Well, they're out to do these kinds of things, and he's in a car with Team Spank; right? If you find a conscious—conscious purpose to avoid knowledge, you may infer knowledge. You can't go through life (inaudible). He knows what's going on. They all know what's going on.

In the final jury instructions, the court instructed the jury:

> Knowledge on the part of a defendant that the crimes charged in the indictment were being committed and that the defendant knowingly and intentionally participated in or helped in the commission of such crimes must be proved by the State beyond a reasonable doubt.
>
> The State must prove an intent to engage in the criminal endeavor. If you find from the evidence in this case that the defendant had no knowledge that a crime was being committed or did not knowingly and intentionally commit, participate, or help in the commission of the alleged offenses, then it would be your duty to acquit such defendant.
>
> On the other hand, should you find beyond a reasonable doubt that the defendant had knowledge that the crimes charged in the indictment were being committed and that the defendant knowingly and intentionally participated or helped in the commission of it, then you would be authorized to convict such defendant.

---

[16] The State presented evidence of the following Facebook messages Parrish sent. On January 18, 2013 (three days before Foley's murder), Parrish told a person who said he "need[ed]" a "lick" that "licks" were "[e]verywhere" and the person should "get some wheels." Also on January 18, Parrish sent a message to another person saying, "I got something." When the person asked what, Parrish responded, "A lick."

29

Knowledge of a violation of a criminal statute may be proved by demonstrating either actual knowledge or deliberate ignorance. If a party has his suspicions aroused but then deliberately omits to make further inquiries, because he wishes to remain in ignorance, he is deemed to have knowledge. The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond a reasonable doubt of conscious purpose to avoid enlightenment would permit an inference of knowledge.

Stated another way, a defendant's knowledge of a fact may be inferred from willful blindness to the existence of the fact. Whether or not you draw such inference is a matter solely within your discretion.

You are not authorized to find a person who was merely present at the scene of the commission of a crime, at the time of its perpetration, guilty of consent in and concurrence in the commission of the crime, unless the evidence shows beyond a reasonable doubt that such person committed the alleged crime, helped in the actual perpetration of the crime, or participated in the criminal endeavor.

After the instructions were finished, Speaks objected to the "deliberate ignorance" instruction.

(b) "A deliberate ignorance instruction is appropriate when the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense

in the event of a subsequent prosecution." *Huckabee v. State*, 287 Ga. 728, 734 n.7 (699 SE2d 531) (2010) (citation and punctuation omitted). "To authorize a jury instruction, there need only be produced at trial slight evidence supporting the theory of the charge." *Gray v. State*, 319 Ga. 72, 75 (901 SE2d 556) (2024) (citation and punctuation omitted).

Because Speaks objected to the trial court's giving the deliberate ignorance instruction, we review the claim as to him de novo. See *Gray*, 319 Ga. at 75 ("Whether the evidence presented is sufficient to authorize the giving of a jury charge is a question of law, which this Court reviews de novo.") (citation and punctuation omitted). But "even when we find error in a jury charge, we will not reverse when the error is harmless, that is, when it is highly probable that the instruction did not contribute to the verdict. To determine whether an instructional error was harmless, we assess it in the context of the instructions as a whole." *Everett v. State*, 318 Ga. 697, 700 (899 SE2d 699) (2024) (citations and punctuation omitted). Moreover, we weigh the evidence as we would expect

31

reasonable jurors to have done. See id.

Speaks argues that there was no evidence that he was deliberately ignorant of any of the charged crimes. We agree. There was no evidence Speaks "was aware of a high probability" that he and Sanders were going to shoot at Harris and Pastures but "purportedly contrived to avoid learning all of the facts." *Huckabee*, 287 Ga. at 734 n.7 (citation and punctuation omitted). Instead, the evidence indicated that he traveled to Harris and Pastures's apartment with Sanders and opened fire at Harris. Thus, the trial court erred by instructing the jury on deliberate ignorance as to Speaks. See id.

However, this error was harmless for the same reason it was error for the trial court to give the instruction: there was no evidence that Speaks was deliberately ignorant. In fact, the State did not even argue that Speaks was deliberately ignorant. Thus, it is highly probable that the jury did not rely on the theory that Speaks was deliberately ignorant of the crimes (rather than fully aware of them), and thus highly probable that the instruction did not contribute to

the verdicts. See *Wilkins v. State*, 308 Ga. 131, 139 (839 SE2d 525) (2020) (explaining that this Court will "generally deem harmless a jury instruction that indicates that a defendant could be found guilty under a theory for which there was no evidence or even argument").

(c) Because Campbell and Parrish did not object to the deliberate ignorance instruction after it was given at trial, we review this claim only for plain error. See OCGA § 17-8-58 (b) (explaining that the failure to make a timely objection to an allegedly improper jury instruction "shall preclude appellate review of such portion of the jury charge, unless such portion of the jury charge constitutes plain error which affects substantial rights of the parties"). This Court has established the following test for "determining whether there is plain error in jury instructions under OCGA § 17-8-58 (b)":

> "First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally,

33

if the above three prongs are satisfied, the appellate court has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings."

*Baker v. State*, 319 Ga. 456, 461-462 (902 SE2d 645) (2024) (citing *State v. Kelly*, 290 Ga. 29, 33 (718 SE2d 232) (2011)). "If one prong of the plain error test is not satisfied, we need not address the other prongs of the test." *Baker*, 319 Ga. at 462.

Pretermitting whether Campbell and Parrish have shown that the trial court committed a clear or obvious error by instructing the jury on deliberate ignorance, their claim fails because any such error did not likely affect the outcome of the trial and thus did not affect Campbell's and Parrish's substantial rights. Even if evidence the State relied on in arguing that Campbell and Parrish were deliberately ignorant—i.e., Parrish's statement that he and Campbell did not know the other men in the car were planning a robbery—constituted slight evidence of deliberate ignorance, the jury was unlikely to credit this evidence, which was contrary to Parrish's account to Buchans and even contrary to Parrish's first

34

story to police officers, in which he said Pastures and the others invited him to take part in a "lick." Thus, the jury was unlikely to find that Campbell or Parrish "ha[d] his suspicions aroused but then deliberately omit[ted] to make further inquiries."

Because Campbell and Parrish have failed to show that the trial court's giving of the deliberate ignorance jury instruction affected their substantial rights, their claim of plain error fails. See, e.g., *Walker v. State*, 311 Ga. 719, 724-725 (859 SE2d 25) (2021) (holding that the alleged error of instructing the jury on an unlawful act with which the appellant was not charged "did not likely affect the outcome of Appellant's trial" where "the jury instructions as a whole . . . left no doubt that the jury could find Appellant guilty only if the State proved that he had attempted to purchase marijuana as charged").

Further, to the extent the defendants argue that the deliberate ignorance instruction could have led the jury to find the defendants guilty without finding that the defendants intentionally participated in the crimes, we reject this argument. The jury was

instructed that to find a defendant guilty, it needed to find both that the "defendant had knowledge" of the crimes and that "the defendant knowingly and intentionally participated" in the commission. We generally presume that the jury follows instructions, see *Rooks*, 317 Ga. at 763, and see no reason not to apply that presumption here.

*Arguments Raised by Campbell*

5. Campbell argues that certain out-of-court statements made by his non-testifying co-defendants should have been excluded from evidence under the Confrontation Clause of the United States Constitution. Specifically, he argues that Parrish's statements to Buchans and Smith's "attempt to concoct his alibi" in the "Declaration of Truth, Sworn Affidavit" should not have been admitted into evidence because Campbell did not have the opportunity to confront Parrish and Smith.[17]

---

[17] In his brief, Campbell mentions several other statements made by his co-defendants that were admitted at trial, but he makes no argument as to why, or even if, these statements were inadmissible. Thus, to the extent he attempts to challenge any of these statements, any such challenge is

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Constitution, Amendment VI. In *Crawford v. Washington*, 541 U.S. 36 (124 SCt 1354, 158 LE2d 177) (2004), the United States Supreme Court explained: "Where testimonial evidence is at issue, . . . the Sixth Amendment demands

---

abandoned. See Supreme Court Rule 22 (1) ("Any enumerated error or subpart of an enumerated error not supported by argument, citations to authority, and citations to the record shall be deemed abandoned.").

As to the statements for which he does challenge the admissibility, he contends that these statements were not made in furtherance of a conspiracy. He does not, however, explain how this affects the admissibility of the statements under the Confrontation Clause contained in the Sixth Amendment to the United States Constitution. We need not decide that question, however, because, as discussed in this division, these statements do not implicate the Confrontation Clause. We also note that the trial court concluded that some co-defendant statements, which would otherwise be inadmissible hearsay, were admissible under OCGA § 24-8-801 (d) (2) (E), because the statements were made in furtherance of a conspiracy. See id. (explaining that "[a] statement by a co[-]conspirator of a party during the course and in furtherance of the conspiracy, including a statement made during the concealment phase of a conspiracy" is not "excluded by the hearsay rule"). See also OCGA § 24-8-802 ("Hearsay shall not be admissible except as provided by this article[.]"). Campbell, however, does not cite these or any other provisions of the Georgia Evidence Code related to hearsay or even argue that the statements were inadmissible hearsay. Thus, we do not consider whether these statements were inadmissible under the hearsay provisions of our Evidence Code.

37

what the common law required: unavailability and a prior opportunity for cross-examination." Id. at 68. See also *State v. Smith*, 302 Ga. 837, 838 (809 SE2d 720) (2018) ("[T]estimonial statements of witnesses absent from trial can be admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine.") (citation and punctuation omitted). And the Court explained in *Bruton v. United States*, 391 U.S. 123 (88 SCt 1620, 20 LE2d 476) (1968), that "powerfully incriminating extrajudicial statements of a codefendant" can "pose[ ] a substantial threat to [a defendant's] right to confront the witnesses against him." Id. at 135-137. "A defendant's right under the Confrontation Clause is violated under *Bruton* . . . when there is a joint trial of co-defendants and the testimonial statement of a co-defendant who does not testify at trial is used to implicate the other co-defendant in the crime or crimes on trial." *Clements v. State*, 317 Ga. 772, 797 (896 SE2d 549) (2023) (citation and punctuation omitted).

"A statement is testimonial if its primary purpose was to

establish evidence for use in a future prosecution." *Hampton v. State*, 308 Ga. 797, 802 (843 SE2d 542) (2020) (citation and punctuation omitted). See also *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (129 SCt 2527, 174 LE2d 314) (2009) (describing "testimonial" statements as "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial'") (citing *Crawford*, 541 U.S. at 51-52). "The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9.

(a) *Campbell's Confrontation Clause Challenge to Parrish's Statement to Jay Buchans*

As discussed in Division 1 above, evidence was presented that Parrish told his cellmate Buchans about Foley's murder. Because Campbell challenged the admission of Parrish's statement to Buchans in the trial court, we review the trial court's decision to admit that statement for an abuse of discretion. See *McCord v.*

*State*, 305 Ga. 318, 322 (825 SE2d 122) (2019). In his interview with police, Buchans described this conversation, which also included Parrish explaining his trial strategy to Buchans, as Parrish "trying to feel me out to see what I could tell him."[18]

Parrish's statement to Buchans was not testimonial. There were no circumstances that "would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Melendez-Diaz*, 557 U.S. at 310 (citation and punctuation omitted). Thus, Campbell's Confrontation Clause argument fails. See *Hampton*, 308 Ga. at 802 (rejecting the defendant's Confrontation Clause argument because a co-defendant's statements to his cellmate "to get advice about his false alibi, not to establish evidence for use in a future prosecution" was not testimonial).

(b) *Campbell's Confrontation Clause Challenge to Smith's "Declaration of Truth, Sworn Affidavit"*

The "Declaration of Truth, Sworn Affidavit" was found in

---

[18] Evidence was presented that Buchans had at least nine prior convictions.

Smith's cell, and, as Campbell highlights, the document includes Smith's attempt to establish an alibi by asserting that he was not at the scene of Foley's murder but was instead taking part in a "major drug trade." Specifically, in the document, Smith explained that although he "made statements prior to this one to seem as if [he] was there and could recall" Foley's shooting, those statements were a part of his plan to frame Campbell and Parrish for the shooting, and the "truth is, [he] wasn't there." Instead, Smith said that he was "actually taking part in a major drug trade" and that "to cover up facts of the drug trade, [he] tried to call on alibis to create a witness." But "it wasn't true," and in fact "[a]ll the statements [he] gave before now were not true."[19]

---

[19] In the document, Smith also gave the following account of what happened the night of the wreck. Smith was riding with Pastures that night because Pastures had contacted him saying "it's an emergency and we really need to talk." While they were driving, Pastures revealed to Smith that Pastures, Campbell, and Parrish were "part of a robbery that went bad." Pastures also told Smith that Campbell sold Smith the gun as part of "a plan [Parrish] and [Campbell] came up with in order to get rid of the murder weapon from the robbery gone bad." Smith wanted to turn in the gun to the police precinct, but Pastures said it was "too late" and instead shot at a man Pastures said "would've carried out the hit from [Parrish] and [Campbell] on him." After the wreck, Smith was "overwhelmed with fear," and he decided that "since no

41

Campbell did not challenge the admission of the "Declaration of Truth" at trial, so our review of the admission of that document is limited to plain error, which, as explained above, requires that, among other things, Campbell must point to an error that was "'clear or obvious, rather than subject to reasonable dispute.'" *Baker*, 319 Ga. at 461-462 (citing *Kelly*, 290 Ga. at 33). See also *Moody v. State*, 316 Ga. 490, 523 (888 SE2d 109) (2023) (explaining that when a defendant fails to object to the admission of evidence at trial, "we apply the four-pronged [plain error] analysis articulated in *State v. Kelly*").

Pretermitting whether the "Declaration of Truth" was

one would probably believe I wasn't part of the murder," he would "at least make sure that [Parrish] and [Campbell] went down for it just like they tried to frame me for it." Smith further asserted in the document that he and his co-defendants were not part of "some type of unit or structured street gang" and "[t]here [were] never any meetings or any orders for violence on anyone's life ever."

On appeal, the only part of the "Declaration of Truth, Sworn Affidavit" that Campbell argues was inadmissible is Smith's "attempt to concoct his alibi." Campbell does not argue that the State presented any other parts of the "Declaration of Truth," such as Smith's assertion that Pastures, Smith, and Campbell were involved in Foley's murder, for the truth of the matter asserted. Thus, we consider only whether Smith's "attempt to concoct his alibi" in the "Declaration of Truth, Sworn Affidavit" was admissible under the Confrontation Clause.

testimonial,[20] Campbell has failed to show that its admission violated the Confrontation Clause because Smith's attempt to establish an alibi for himself in the "Declaration of Truth" was presented by the State not to show its truth, but to show that Smith was shifting his story and creating a new narrative to exculpate himself. After Investigator Sammons testified about Smith's statement in the document that he heard about the attempted robbery from Pastures while they were in the car on the night of the wreck, the following exchange between the prosecutor and Investigator Sammons occurred:

> PROSECUTOR: And is this basically an explanation of things that are happening the night of this wreck?
> INVESTIGATOR SAMMONS: Yes.
> PROSECUTOR: Or the explanation that he's giving at this point?
> INVESTIGATOR SAMMONS: Well, that's an explanation, yes.

---

[20] There were some indications in the document that Smith intended to give it to government officials for use in trial. Specifically, the document begins with a letter from Smith to the District Attorney and Assistant District Attorney, in which Smith requests that he be granted a plea deal for 15 years in exchange for giving the State this "Declaration of Truth" that "will stand at the trial of my codefendants as testimony." However, the document was not actually sworn or given to law enforcement.

And in closing argument, the prosecutor noted that Smith's counsel had argued that the "Declaration of Truth" was true and Smith "knew about the murder because James Pastures told him about it." The prosecutor then said:

> Problem. You're telling us what's in that declaration of truth is truth. Well, in that letter, Kevin Smith says that he was in a major drug deal, not at his mom's. So if you're saying that's true, why do you put up mom to come in here and give you an alibi?[21] Because none of it is true. The truth is, he was at the scene. He was involved in the murder of Rebecca Foley and he's guilty. All of these lies equal guilt.

Because this document was introduced for "purposes other than establishing the truth of the matter asserted," Campbell has not shown that it was a clear and obvious error for the trial court not to exclude the document under the Confrontation Clause. See *Crawford*, 541 U.S. at 59 n.9 ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."). See also *Myrick v.*

---

[21] Smith called his mother as a witness at trial, and she testified that Smith was at home with her and his daughter on the evening of Foley's murder.

*State*, 306 Ga. 894, 901-902 (834 SE2d 542) (2019) (holding that the admission of a detective's recounting of an unavailable witness's statements "did not violate the Confrontation Clause" because the detective's recounting was "clearly not meant to establish as true" what the witness had said) (citation and punctuation omitted); *Carter v. State*, 302 Ga. 200, 204-205 (805 SE2d 839) (2017) ("[E]ven if we were to assume that Walker's recorded statements are testimonial, an assumption that is highly questionable, there is no [C]onfrontation [C]lause violation where, like here, the out-of-court statements are used for 'purposes other than establishing the truth of the matter asserted.'") (citations omitted).

6. Campbell also contends that the trial court erred by admitting evidence of his gang membership because it was not relevant. See OCGA § 24-4-402 ("Evidence which is not relevant shall not be admissible."). Campbell was charged with eight counts of violating the Gang Act. These counts alleged that Campbell participated in criminal gang activity "while associated with a criminal street gang, to wit: Bloods." See OCGA § 16-15-4 (a) ("It

45

shall be unlawful for any person employed by or associated with a criminal street gang to conduct or participate in criminal gang activity through the commission of any offense enumerated in paragraph (1) of Code Section 16-15-3."). Thus, the State was required to prove, among other things, that Campbell was "associated with" the Bloods street gang, so evidence proving his membership in this gang was relevant, and the trial court did not err by admitting it. See *Rooks*, 317 Ga. at 753 (explaining that to prove that the defendants "participated in criminal street gang activity under OCGA § 16-15-4 (a), the State was required to prove," among other things, "the defendant's association with the gang") (citation and punctuation omitted).[22]

---

[22] Campbell appears to argue that because the State did not prove that the crimes committed against Foley were meant to "further the interest of the gang," see OCGA § 16-15-4 (a), evidence of his gang membership was not admissible. See *Rooks*, 317 Ga. at 753 (explaining that to prove a violation of OCGA § 16-15-4 (a), the State was required to prove, among other things, that "the crime was intended to further the interest of the gang.") (citation and punctuation omitted). This argument, however, sounds in sufficiency, not admissibility. And neither of the two cases cited by Campbell to support this argument dealt with the exclusion of evidence because the State had failed to prove a nexus between the gang and the criminal activity. Instead, these cases explained that such a failure meant that a conviction for a gang charge could

7. Parrish contends that the trial court erred by allegedly allowing the State to change its plea offer after Parrish accepted it.

(a) Before voir dire began on the first day of trial, the trial court stated that it was the court's understanding that all of the defendants except Parrish had rejected the State's plea offers and asked what the State's position was as to entering a plea agreement with Parrish. The State responded: "[A]bsent the terms that we had discussed we are not willing to proceed." The court responded: "You haven't come to a meeting of the minds with regard to the requirements?" The State agreed with the trial court's characterization, but Parrish's counsel disagreed, explaining:

> The terms being discussed now were not discussed prior to my talking to Mr. Parrish. The initial terms were—and I was very—I felt very certain that he would plead. He would receive life with the possibility of parole,

not stand. See *Moore v. State,* 305 Ga. 251, 254 (824 SE2d 377) (2019) (explaining that "the trial court ultimately set aside Moore's conviction on the charge of criminal gang activity . . . based on its finding that the evidence failed to show the requisite nexus between Moore's crimes and furtherance of the gang's interests") (punctuation omitted); *In the Interest of W. B.,* 342 Ga. App. 277, 277, 283 (801 SE2d 595) (2017) (reversing the adjudication of delinquency for criminal gang activity because there "was insufficient [evidence] to support a finding that [the appellant] had engaged in criminal gang activity").

plus a number of years. Okay, and that was the entire agreement, and he accepted that agreement.

The prosecutor responded:

The only thing that we were trying to find out at the time that counsel was sent back, was whether or not any of these defendants would be willing to plead to murder and plead to life. The additional terms and negotiations were left to after we get past that hurdle. That was my understanding.

She further explained:

We have not reached any of the additional terms under these circumstances and . . . it is the State's position that absent some sort of actual verifiable proffer from Mr. Parrish and—and given the extensive statements and their use—possibly used against him at trial. He is not very reliable as a witness. We'd have to get something additional from him. He's not willing to do that. And because of where we are and the posture of this case, we're not willing to proceed with any kind of plea offer at this time, absent his actual testimony.

The trial court pointed out that if Parrish entered a plea agreement, he would be subject to subpoena to testify, and the prosecutor agreed, again saying, "[W]e are not comfortable proceeding, absent some nailed down sense of what he would say." The court said it understood that Parrish was not inclined to provide

48

testimony, and Parrish's attorney agreed, but further explained that he thought the offer he presented to Parrish "was a complete offer" and "[a]ll this other stuff came up for him subsequently accepting the offer of life, plus a number of years, with the possibility of parole. It was never discussed that all five had to take it or he had to testify or anything like that. It was never even mentioned."

The court asked Parrish about the plea offer on the record. Parrish's counsel reiterated: "[T]he first offer we related to Mr. Parrish, the offer subsequently had more conditions added to it and he's aware of the new conditions that were added." The State then put on the record what the offer would be:

> [T]he basics of it would be murder, [Parrish] would enter a plea to life. We would take life without parole off the table. So, it would be a life sentence. He would be eligible for parole. And there was a number of years, I believe, ninety years consecutive. Again, that would be negotiable if Mr. Parrish was able to provide testimony and confirm what he would say, if called as a witness.

The court then went over the possible sentences for each of the charges Parrish faced and asked if Parrish accepted or rejected the offer. Parrish rejected the offer.

At the motion for new trial hearing, Parrish's attorney testified that after the first trial ended in a mistrial, the State extended plea offers to the defendants to plead for life:

> [T]hat was all they said, was he can plead to life. And we were given an opportunity to meet with Mr. Parrish in the courtroom by ourselves to discuss it. And he accepted. He was gonna plead and take the life sentence because they were seeking life without parole.

Counsel explained that all of the other defendants rejected the plea, and then Parrish was "told that either every single one of the defendants had to plead or [Parrish] had to testify against the codefendants. But that was not originally—there were no conditions when we were originally offered the plea." On cross-examination, Parrish's trial counsel acknowledged that Parrish could have been called on to testify even if his testimony was not expressly part of the plea deal, but counsel had not discussed this possibility with Parrish. In denying Parrish's motion for new trial, the court concluded that Parrish "did not prove the requisite meeting of the mind[s] or the intent to accept the plea knowing he would be subject to be called by the State to testify."

(b) In making this argument that the trial court erred by "allowing the State to modify its plea offer after it was accepted," Parrish relies heavily on *Syms v. State*, 331 Ga. App. 225 (770 SE2d 305) (2015), in which the Court of Appeals held that the trial court erred by denying the appellant's motion to enforce a plea agreement. See id. at 226-228. In *Syms*, defense counsel and the State affirmed to the trial court at a calendar call that "they had reached a plea agreement," but the State later attempted to change that agreement. Id. Thus, the Court of Appeals concluded: "This is simply a case where an agreement as to terms was clearly made, and then the State changed its mind and no longer wanted to honor the plea agreement." Id. at 228 (citation and punctuation omitted).

Here, by contrast, the evidence indicated that Parrish and the State had *not* settled on the terms of the agreement. The record shows that the parties never presented a plea agreement to the trial court or represented that they had reached such an agreement regarding the terms of any plea agreement. Even when a potential agreement was discussed, the State represented that its

understanding was that the plea negotiation was not finished when Parrish's attorney brought the first part of the offer to Parrish to see if he had any interest in pleading guilty, and the trial court apparently found the State's understanding credible. See *Goodwin v. State*, 319 Ga. 842, 845 (907 SE2d 301) (2024) (explaining, in the context of the withdrawal of a guilty plea, that credibility determinations are within the purview of the trial court and that if the "trial court does not make explicit factual and credibility determinations, we presume implicit findings were made supporting the trial court's decision") (citation and punctuation omitted). And then Parrish rejected the State's plea offer on the record after the trial court informed him of the possible sentences for each charge.

Thus, because Parrish has failed to show that the State modified its plea offer as he alleges, this claim fails.

*Arguments Raised by Sanders*

8. Sanders contends that the trial court erred by disqualifying John Rodman as his counsel.

(a) Sanders hired John Rodman to represent him before trial;

52

Rodman filed an entry of appearance on July 27, 2018, and he represented Sanders at a pre-trial hearing on August 16, 2018. At that hearing, the trial court noted that Rodman had a potential conflict of interest because he was also representing Yusef, Sanders's father, and the State asserted that it might call Yusef as a witness.

In an order entered on August 23, 2018, the trial court held that Rodman was disqualified from representing Sanders. The court explained that Yusef was indicted on weapons charges based on evidence that was seized pursuant to a search warrant executed in connection with Sanders's indictment in this case and that the State planned to present evidence about an April 2012 incident in which Yusef and Sanders allegedly shot at a residence with the gun used in Foley's murder.[23] The State also planned to present evidence that Yusef had contacts with gang leaders out of state and that some of Sanders's co-defendants were calling Yusef from prison to seek

---

[23] Evidence was presented that in April 2012, Sanders and Yusef shot at a residence in retaliation for one of their relatives being harmed; a bullet found at that residence forensically matched the gun used to shoot Foley.

advice about the case. The court noted that although Rodman concluded that there was no conflict, the case was complex (involving many defendants and counts), and Rodman "[could] not anticipate every question that the State might ask . . . that could implicate Yusef or [Sanders] in the numerous alleged activities connected to this indictment." The trial court further explained that if Yusef testified "in a manner that is contrary to Mr. Rodman's understanding or that is adverse to Shacqeal Sanders'[s] case, Mr. Rodman could quickly find himself in a quandary about impeaching one client, Yusef Sanders, or providing ineffective assistance of trial counsel to the other client, Shacqeal Sanders," and noted that "Yusef Sanders is not a third party witness who is merely connected to this indictment by his familial connection to Shacqeal Sanders. . . . [H]e is implicated in at least two incidents involving firearms that are either directly or potentially linked to Shacqeal Sanders."

Citing Georgia Rule of Professional Conduct 1.7 (c) (3), which says that "[c]lient informed consent is not permissible if the representation . . . involves circumstances rendering it reasonably

54

unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients," the court further concluded that "[a] waiver would not be appropriate in this set of circumstances." At the next hearing, on August 28, 2018, the trial court informed Sanders that Rodman could not represent him, and Sanders objected to this ruling.

Although Yusef was subpoenaed for trial, he was never called as a witness. However, evidence about the April 2012 incident was presented, and the State played for the jury the recording of a jail call in which Sanders talked to another gang member about the trial for Foley's and Pastures's murders and Sanders told the member: "Push up on pops. Holler at him" to get information. Additionally, Yusef was charged with criminal contempt in relation to his violation of the rule of sequestration at Sanders's trial.[24]

---

[24] On October 26, 2018, the trial court held a contempt hearing at which Yusef was represented by Rodman. Investigator Sammons testified that Sanders called Yusef from jail on October 23 and 24, and Yusef told Sanders that he was arranging to have people come into the courtroom for trial so he had "eyes and ears in the courtroom." Investigator Sammons explained that Yusef knew that because he had been served with a subpoena as a potential

At the motion for new trial hearing, Rodman testified that he was hired to represent Yusef, who was charged with possession of a firearm by a convicted felon, and within "a couple of months," Rodman was also retained to represent Sanders. Rodman determined that there was no conflict in representing both of them, and Sanders and Yusef were willing to waive any potential conflict. In denying Sanders's motion for new trial, the motion for new trial court held that the trial court properly exercised its discretion by disqualifying Rodman, explaining:

> Neither Rodman nor appellate counsel has shown how Rodman could have ethically proceeded where his client Yusef was involved in an incident involving use of the murder weapon, was integral to the concealment phase of the conspiracy, and an active participant in attempted disruption of the trial proceedings by gaining knowledge in violation of the rule of sequestration. Nor has there been any effort to show how thorough and sifting cross-examination of Yusef could have been conducted by his own attorney.

(b) A criminal defendant who does not require appointed

---

witness, he was not allowed to come into the courtroom or to learn about what happened in the courtroom. The trial court concluded that Yusef had violated the rule of sequestration and sentenced him to serve 20 days in prison.

counsel has a right to choose who will represent him, and that right is guaranteed by the Sixth Amendment to the United States Constitution and Article I, Section I, Paragraph XIV of the Georgia Constitution of 1983. See *Registe v. State*, 287 Ga. 542, 544 (697 SE2d 804) (2010).

> The right to choose one's counsel is not unqualified, however. As relevant to this case, it is well-established that a defendant does not have a right to be represented by an attorney who is ethically prohibited from doing so, most commonly due to a conflict of interest.

Id. "[T]he courts must recognize a presumption in favor of [an accused's] counsel of choice, but that presumption may be overcome not only by a demonstration of actual conflict [of interest] but by a showing of a serious potential for conflict." *Heidt v. State*, 292 Ga. 343, 346 (736 SE2d 384) (2013) (citation and punctuation omitted).

Rule 1.7 (a) of the Georgia Rules of Professional Conduct prohibits a lawyer from representing a client "if there is a significant risk that . . . the lawyer's duties to another client . . . will materially and adversely affect the representation of the client." Although this representation is permitted in some situations if both clients give

informed consent, see Rule 1.7 (b), if the representation "involves circumstances rendering it reasonably unlikely that the lawyer will be able to provide adequate representation to one or more of the affected clients," such representation is not permissible even with client informed consent. See Rule 1.7 (c) (3). See also *Registe*, 287 Ga. at 544 ("The defendant's waiver of his attorney's conflict of interest does not always cure the problem, because courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them.") (citation and punctuation omitted). "The trial court's decision on whether an ethical requirement bars a lawyer from representing a defendant is reviewed on appeal for abuse of discretion." Id.

Sanders argues that because the State only postulated about what might happen with respect to Yusef that could create a potential conflict of interest and did not call Yusef as a witness at trial and Sanders waived any potential conflict inherent in the representation, the trial court abused its discretion by disqualifying

Rodman as his counsel. We disagree.

Although the State ultimately did not call Yusef as a witness, at the time when the trial court had to rule on Rodman's ability to serve as Sanders's counsel ethically, the trial court reasonably expected Yusef to be called as a witness. Moreover, evidence of Yusef's involvement with the charged crimes was in fact presented at trial. See *Wheat v. United States*, 486 U.S. 153, 162 (108 SCt 1692, 100 LE2d 140) (1988) (a trial court "must pass on the issue whether or not to allow a waiver of a conflict of interest by a criminal defendant not with the wisdom of hindsight after the trial has taken place").[25] The trial court did not abuse its discretion in this regard.

Likewise, the trial court did not abuse its discretion by determining that Sanders's purported willingness to waive the conflict did not allow for Rodman's representation because it was

---

[25] Sanders implies that the State never actually intended to call Yusef and instead raised this possibility only to disqualify Sanders's chosen counsel. But Sanders points to no record evidence supporting that theory, and we see none. To the contrary, the evidence presented at Sanders's trial showed that the connections between Yusef and the charged crimes gave the State good reason to anticipate that it may call Yusef as a witness at that trial.

"reasonably unlikely" that Rodman would "be able to provide adequate representation" to both Yusef and Sanders given Sanders's connection with the charged crimes and the potential that Rodman would be faced with the "quandary" of "impeaching one client . . . or providing ineffective assistance of trial counsel to the other client." See Rule 1.7 (c) (3). See also *Heidt*, 292 Ga. at 345 (holding that the trial court did not abuse its discretion by disqualifying the defendant's chosen counsel when counsel also represented someone "who was anticipated to testify in the prosecution of Heidt, and who herself was charged with intimidating a witness in his prosecution"). Thus, Sanders's claim fails.

*Arguments Raised by Speaks*

9. Speaks contends that the trial court erred by denying his request for a jury instruction on common criminal intent. Speaks requested that the jury be charged that "a common criminal intent must be proven in order to establish a defendant is a party to a crime." The trial court declined to give this instruction, and Speaks objected.

> To determine whether a trial court erred in failing to give a requested jury instruction, we must read and consider the instructions as a whole. Where the jury charge, taken as a whole, sufficiently instructs the jury on a point of law, a trial court does not err in failing to give an unnecessary, additional instruction.

*Payne v. State*, 318 Ga. 249, 257 (897 SE2d 809) (2024) (citation and punctuation omitted).

Here, as quoted in Division 4 (a) above, the jury was instructed that it should not find a defendant guilty unless it found beyond a reasonable doubt that he "knowingly and intentionally participated or helped in the commission of" the charged crime, and the jury was instructed that it was not authorized to find guilty someone who was "merely present" at the scene of the crime. Viewed as a whole, the jury was adequately instructed on party to the crime, and the trial court did not err by failing to give this additional instruction about intent. See *Payne*, 318 Ga. at 257. See also *Adkins v. State*, 314 Ga. 477, 483 (877 SE2d 582) (2022) ("We see no error in the trial court's decision not to give the requested charge on grave suspicion because the concept was covered in other jury instructions that the court did

61

give to the jury.").

10. Speaks contends that the trial court erred by commenting in front of the jury that Speaks requested a jury instruction on justification.

(a) During Speaks's closing argument, his attorney mentioned documents seized from Speaks's jail cell that discussed a plan to offer a self-defense story to explain Pastures's murder. In particular, counsel indicated that the jury was "probably going to believe it's false." The State then objected, saying: "[Speaks's attorney] just said that that could be false. He's requested a charge on self-defense, which is an affirmative defense that requires the admission of the act. He cannot now argue that it is false." The court responded, "I thought that was made clear," and pointed out that Speaks requested the self-defense charge. Speaks's counsel agreed. The court said: "You need to stick with your—you requested that charge. It's in the charge, because you requested it." But the court also acknowledged that Speaks could "present alternate theories." The court told Speaks's counsel to "leave it there," and counsel

apologized. Counsel then resumed his closing argument. After he had finished his closing argument and the jury had been excused, counsel noted his objection to the court saying in front of the jury that he requested the jury charge on justification, and the court noted the objection for the record.

In the final jury instructions, the trial court explained to the jury that "[i]n jury trials, the lawyers of the parties submit their requests to charge. And they're required to do that by a Uniform Superior Court Rule. And all of them did so." The court also explained: "An affirmative defense is a defense that admits the doing of the act charged, but seeks to justify, excuse, or mitigate it. . . . Speaks and [Sanders] have raised the affirmative defense of justification." Then the court explained the defense of justification.

(b) OCGA § 17-8-57 (a) (1) provides: "It is error for any judge, during any phase of any criminal case, to express or intimate to the jury the judge's opinion as to whether a fact at issue has or has not been proved or as to the guilt of the accused." Speaks asserts that the trial court's comment—that is, that Speaks requested an

instruction on self-defense—was, in effect, expressing an opinion on an issue. Speaks did not, however, raise a timely, contemporaneous objection to the trial court's statement, because he did not object as soon as the trial court told the jury that he requested the instruction; instead, he waited to raise this objection until after he had finished his closing argument and the jury had been excused. See *Cowart v. State*, 294 Ga. 333, 336-337 (751 SE2d 399) (2013) (holding that Cowart's objection to a statement the prosecutor made "[n]ear the end of the State's rebuttal closing argument" was "not timely" because Cowart did not raise it until "[a]fter the prosecutor completed her argument about a minute later" and "the jury left the courtroom").

We therefore limit our review of this claim to plain error. See OCGA § 17-8-57 (b) ("Except as provided in subsection (c) of this Code section, failure to make a timely objection to an alleged violation of paragraph (1) of subsection (a) of this Code section shall preclude appellate review, unless such violation constitutes plain

64

error which affects substantive rights of the parties.").[26] As discussed above, to show plain error, Speaks must show, among other things, that the trial court committed an error that was "'clear or obvious, rather than subject to reasonable dispute.'" *Baker*, 319 Ga. at 461-462 (citing *Kelly*, 290 Ga. at 33). See also *Bamberg v. State*, 308 Ga. 340, 352 (839 SE2d 640) (2020) (applying the plain error test described in *Kelly* to evaluate a claim for plain error under OCGA § 17-8-57 (b)).

Speaks has failed to make this showing. Speaks asserts that with the above exchange, the trial court expressed an opinion on an issue by informing the jury that Speaks "admitted the act forming the basis of the offense." To begin, it is not at all clear what alleged falsehood "it" referred to in the prosecutor's assertion, "He cannot now argue that it is false." More importantly, the trial court's response of "I thought that was made clear" and explanation that Speaks had requested a self-defense instruction appear to have done nothing more than inform the jury that Speaks requested an

---

[26] Subsection (c) is discussed in footnote 28 below.

instruction on self-defense. The court then explained to the jury in its final charge that attorneys request certain charges, and the court explained the defense of justification. It is not clear or obvious that the trial court's comment, particularly when considered in context, constitutes expressing an opinion on any issue in violation of OCGA § 17-8-57. See, e.g., *Roberts v. State*, 305 Ga. 257, 263 (824 SE2d 326) (2019) ("Given the context in which the comments [that it was 'important' for the jury to 'get your sense of whatever you are to glean from this video tape here in the courtroom' because it would not have the video during deliberations] were made, it is hardly clear and obvious that the jurors would have viewed the judge's instructions as commenting on the weight of the evidence as opposed to providing a straightforward explanation that they would not have additional opportunities to review the video during deliberations."); *Nalls v. State*, 304 Ga. 168, 173-174 (815 SE2d 38) (2018) (holding that the trial court's failure to give an instruction limiting the self-defense instruction to the defendant who requested it was not an expression or intimation of the judge's "opinion as to what has or has

66

not been proved or as to the guilt of the accused" because, considered in context, "no reasonable jury would have understood the court's abstract statements about the law as intimating that the judge believed that [the defendant] had shot [the victim]").

Moreover, in making his argument, Speaks relies on two Court of Appeals cases that indicated that "[g]enerally, a prosecutor should refrain from mentioning that the defendant requested the lesser included charge." *Woodruff v. State*, 356 Ga. App. 659, 665 (848 SE2d 670) (2020) (citing *Newman v. State*, 334 Ga. App. 439, 441 (779 SE2d 678) (2015)).[27] Speaks has not cited any cases, however— nor have we found any—indicating that the *trial court's* statement that Speaks requested an instruction on a specific *affirmative defense* was an erroneous expression of an opinion. Thus, in order to conclude that the trial court erred here, we would need to

---

[27] *Woodruff* and *Newman* did not rely on OCGA § 17-8-57, as Speaks does here, because they dealt with statements made by the prosecutor, rather than the trial court. See OCGA § 17-8-57 (a) (1) ("It is error for *any judge . . .*"), (c) ("Should *any judge . . .*") (emphasis added). We do not determine whether these cases were correctly decided.

substantially expand the Court of Appeals precedent noted above, and "an error is not plain under current law if a defendant's theory requires the extension of precedent." *Wilson v. State*, 312 Ga. 174, 179 (860 SE2d 485) (2021) (citation and punctuation omitted).[28] Speaks's claim of plain error therefore fails on the second prong of plain-error review. See *Roberts*, 305 Ga. at 263.

11. Speaks contends that the evidence was not sufficient as a matter of constitutional due process to support his convictions for

[28] To the extent Speaks contends that he is entitled to a new trial because the trial court "express[ed] an opinion" as to his guilt, this argument also fails. See OCGA § 17-8-57 (c) ("Should any judge express an opinion as to the guilt of the accused, the Supreme Court or Court of Appeals or the trial court in a motion for a new trial shall grant a new trial."). The trial court's indication that Speaks requested an affirmative defense was not an expression of an opinion on Speaks's guilt of the charged crimes. See *Boyd v. State*, 306 Ga. 204, 214-215 (830 SE2d 160) (2019) (holding that the court's instruction that "[p]arties to a crime is a legal concept" that would be explained in the court's final jury instructions was not an expression of the defendant's guilt).

To the extent Speaks raises an additional argument based on the prosecutor's statement about what is required to assert an affirmative defense, it is not preserved for appellate review because Speaks did not raise this objection at trial. The plain-error review provided by OCGA § 17-8-57 does not apply to statements made by prosecutors, and we see no other basis to apply plain-error review to such a claim. See *Gates v. State*, 298 Ga. 324, 328-329 (781 SE2d 772) (2016) (explaining that Georgia's Evidence Code provides for plain-error review of rulings that admit or exclude evidence and thus does not provide for plain error review of a prosecutor's statements during closing argument, which are not evidence).

68

malice murder, conspiracy to murder Harris, possession of a firearm during the commission of a felony, and violation of the Gang Act. A criminal conviction cannot stand if "it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (99 SCt 2781, 61 LE2d 560) (1979). In considering this claim, we view the evidence in the light most favorable to the convictions. See id. at 319. "Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime." OCGA § 16-2-20 (a). See also *Ward v. State*, 316 Ga. 295, 298 (888 SE2d 75) (2023) ("To be convicted as a party to a crime, the defendant must have shared a common criminal intent with the direct perpetrators of the crime, which may be inferred from presence, companionship, and conduct before, during, and after the offense.") (citation and punctuation omitted).

As discussed above, the evidence presented at trial showing that Speaks committed the charged crimes included eyewitness

testimony that Speaks and Sanders drove to Pastures and Harris's apartment together, that they called Harris to the car, and that Speaks shot at Harris as Sanders shot at Pastures. The evidence also showed that Speaks was a high-ranking member of the EGB gang and that Pastures had been "put on a plate" by the gang because he was suspected of talking to the police. As a matter of constitutional due process, this evidence was sufficient to support the jury's conclusion that Speaks was a party to Pastures's murder, which was committed with "malice aforethought";[29] that Speaks conspired with Sanders to murder Harris,[30] that Speaks possessed a firearm during the commission of these felonies,[31] and that Speaks

---

[29] "A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being." OCGA § 16-5-1 (a).

[30] "A person commits the offense of conspiracy to commit a crime when he together with one or more persons conspires to commit any crime and any one or more of such persons does any overt act to effect the object of the conspiracy." OCGA § 16-4-8.

[31] "Any person who shall have on or within arm's reach of his or her person a firearm . . . during the commission of . . . : (1) Any crime against or involving the person of another; . . . and which crime is a felony, commits a felony." OCGA § 16-11-106 (b).

violated the Gang Act by committing these crimes to further the interests of the gang of which he was a member.[32] See *Ward*, 316 Ga. at 298-299 (holding that the evidence was sufficient for the jury to find the appellant guilty as a party to the crime of murder and aggravated assault where an eyewitness identified the appellant as one of the parties involved in the victim's stabbing, and the witness explained that Ward's gang was executing the "hit" put out on the victim); *Dixon v. State*, 309 Ga. 28, 34 (843 SE2d 806) (2020) (holding that the evidence was sufficient to prove a violation of the Gang Act where the evidence showed that the charged offense was committed "to retaliate for [one of the victims'] verbal and physical conduct that

---

[32] To establish that a defendant violated OCGA § 16-15-4 (a), the State must prove

> (1) the existence of a "criminal street gang," defined in OCGA § 16-15-3 (3) as "any organization, association, or group of three or more persons associated in fact, whether formal or informal, which engages in criminal gang activity"; (2) the defendant's association with the gang; (3) that the defendant committed any of several enumerated criminal offenses, including those "involving violence, possession of a weapon, or use of a weapon"; and (4) that the crime was intended to further the interests of the gang.

*Rooks*, 317 Ga. at 753 (citation and punctuation omitted).

Dixon viewed as disrespectful of Dixon's gang").[33]

*Cumulative Error Analysis*

12. We have held that as to Parrish, Campbell, and Speaks, the trial court made two errors.[34] Thus, we consider whether the cumulative prejudicial effect of these errors deprived the defendants of a fair trial. See *Nundra v. State*, 316 Ga. 1, 16 (885 SE2d 790) (2023) ("When this Court has identified or presumed more than one error, although the effect of each on its own might have been harmless to the defendant's trial, we have looked to whether the combined effect of the errors harmed the defendant.").

As to all three defendants, we have concluded that or pretermitted whether the trial court erred by admitting evidence of

[33] Speaks asserts that the jury's verdicts were "inconsistent." For example, the jury could not reach a verdict on the attempted murder (Harris) count, but it found Speaks guilty of conspiracy to commit murder as to Harris. Any inconsistency, however, does not prove that the evidence was insufficient as a matter of constitutional due process. See *Howard v. State*, 318 Ga. 681, 684 (899 SE2d 669) (2024) ("[A]n acquittal on one count is not itself a basis to challenge the sufficiency of the evidence as to another count.").

[34] We need not do any review of the effect of cumulative errors as to Sanders because he "has failed to establish any trial court errors." *Blocker v. State*, 316 Ga. 568, 583 (889 SE2d 824) (2023).

juror intimidation and instructing the jury on deliberate ignorance.

It is "highly probable" that the combined effect of these two errors

"did not contribute to the verdict." *State v. Lane*, 308 Ga. 10, 21 (838

SE2d 808) (2020) (explaining that in considering cumulative

prejudice, we must "bear in mind the relevant standards for the

errors at issue" and reiterating that "a nonconstitutional trial court

error is harmless if the State shows that it is highly probable that

the error did not contribute to the verdict") (citation and punctuation

omitted).[35] As discussed above, the State presented no evidence that

Parrish or Campbell directed the juror intimidation, and the

evidence that they were fully aware of the planned robbery of Foley

was strong, whereas any evidence that they were "deliberately

ignorant" was quite weak. As to Speaks, he had no association—not

even familial—with the juror intimidation evidence, and he did not

---

[35] Although we reviewed one of the errors as to Campbell and Parrish for only plain error, we need not decide how that could affect our evaluation of the cumulative harm because these claims fail even under the stricter harmless-error standard for preserved non-constitutional errors. See *Lane*, 308 Ga. at 21 (declining to "decide exactly how multiple standards may interact under cumulative review of different types of errors").

claim that he was ignorant of the charged crimes. Moreover, the jury was instructed to disregard the juror intimidation evidence if it did not find that a defendant authorized the intimidation, and the jury was instructed that it could find a defendant guilty only if the State proved beyond a reasonable doubt that the "defendant had knowledge" of the crimes *and* that "the defendant knowingly and *intentionally* participated" in the commission. (Emphasis added.) There is no evidence that the jurors did not follow these instructions. Thus, it is highly probable that the cumulative effect of the two trial court errors did not affect the jury's verdicts as to Parrish, Campbell, and Speaks. See *Nundra*, 316 Ga. at 16 (holding that it was "highly probable" that the court's erroneous admission of two pieces of evidence did not contribute to the verdict where even though "the 1997 convictions for a violent crime held the potential for prejudice, and the good character evidence invited sympathy for the victim and his widow, the jury was charged that it was not permitted to be influenced by sympathy for either party," and we "typically presume juries follow the instructions that they are given by the trial court,

74

absent evidence to the contrary").

*Judgments affirmed. All the Justices concur.*

Decided October 22, 2024 — Reconsiderations denied November 14, 2024.

Murder. Chatham Superior Court. Before Judge Abbot, Senior Judge.

*Zell & Zell, Rodney S. Zell*, for appellant (case no. S24A0578).

*Robert L. Persse*, for appellant (case no. S24A0580).

*Steven L. Sparger*, for appellant (case no. S24A0581).

*David T. Lock*, for appellant (case no. S24A1180).

*Shalena Cook Jones, District Attorney, Gabriel A. Justus, Lyle Burnham II, Richard S. Harrison, Assistant District Attorneys; Christopher M. Carr, Attorney General, Beth A. Burton, Deputy Attorney General, Clint C. Malcolm, Meghan H. Hill, Senior Assistant Attorneys General, Matthew B. Crowder, Assistant Attorney General*, for appellee.